## In re GRICE.

### (Circuit Court, N. D. Texas. February 22, 1897.)

### No. 2,062.

1. HABEAS CORPUS—CUSTODY NECESSARY TO AUTHORIZE WRIT.
   Even if the writ is not authorized in behalf of a person at large on bail, yet if he surrender himself, or is surrendered by his sureties, and is in actual confinement, the writ may issue, and the court will not consider an objection that he was surrendered by collusion with his sureties.
2. SAME—POWER TO RELEASE PERSONS PROSECUTED IN STATE COURTS.
   While the general rule is that persons prosecuted in state courts will not be released by the federal courts on writs of habeas corpus, but will be left to reach the supreme court of the United States by writ of error, yet a federal court has the power to do so if special circumstances should require; possessing a discretion in the matter which must be governed by the facts in each case.
3. SAME.
   Where it appeared that a petitioner for a writ of habeas corpus had been indicted in a state court jointly with others, one of whom had been tried and convicted, and upon appeal to the court of last resort had been remanded because there was no testimony to sustain the verdict, and that court, without deciding the question of the constitutionality of the statute, intimated that it regarded it as constitutional; and it appeared further that the statute under which the indictment was found makes an offense under it a felony, and prevents the petitioner from giving bond after conviction, and compels him to submit to incarceration during all the time required for an appeal to the court of criminal appeals, and from there to the supreme court of the United States,—these facts, together with the rulings of the trial judge in the case which has been tried, and the delay since that trial was had, constitute circumstances under which a federal court is called on to exercise its discretion in assuming jurisdiction in a writ of habeas corpus.
4. CONSTITUTIONAL LAW — EXTRATERRITORIAL LEGISLATION — "ANTI-TRUST LAWS."
   The provision in the Texas anti-trust law of 1889 that persons outside the state may commit offenses under the statute, and be liable to indictment therefor, is null and void.
5. SAME—CONTRACTS IN RESTRAINT OF TRADE.
   It is not every restriction of competition or trade that is illegal or against public policy, or that will justify police regulation, but only such as are unreasonable or oppressive; and a state statute which prohibits combinations formed for the purpose of reasonably restricting competition violates the rights of contract guarantied by the federal constitution.
6. SAME.
   A state statute, such as the Texas anti-trust law of 1889, which makes it criminal for two persons to combine, as partners, corporators, or other-

wise, in the ordinary business of life, to increase or reduce the price of commodities, or fix the standard thereof, or for two persons to agree to limit or reduce the production of commodities, or for two persons to combine for the purpose of limiting competition, or to make any agreement in relation to the price of an article, so as to preclude free and unrestricted competition between them or themselves and others, or for two persons to create or carry out restrictions in trade, violates the fourteenth amendment to the constitution of the United States, because it denies to citizens of the United States the right to make valid contracts with respect to their business and property.

7. "EQUAL PROTECTION OF THE LAWS" DEFINED.

By "equal protection of the laws," as used in the fourteenth amendment to the constitution of the United States, is meant equal security under them to every one under similar terms,—in his life, liberty, property, and in the pursuit of happiness.

8. SAME—CLASS LEGISLATION.

A state statute, prohibiting all combinations in restriction of competition or trade, which exempts from its provisions "agricultural products or live stock while in the hands of the producer or raiser" (the Texas anti-trust law of 1889), is class legislation, and violates that part of the fourteenth amendment to the constitution of the United States which declares that no state shall deny to any person within its jurisdiction the equal protection of the laws. And the fact that the persons thus exempted are not in a position to combine does not remove the objection to the discrimination in their favor.

This was a petition by William Grice for a writ of habeas corpus.

John D. Johnson and Clark & Bolinger, for relator.

M. M. Crane, Atty. Gen., and C. F. Thomas, for respondent.

SWAYNE, District Judge. This petition, filed by leave of the court on December 9, 1896, at Waco, in the Northern district of Texas, and subsequently transferred to Dallas for hearing, and filed there December 18, 1896, states:

That the petitioner, Wm. Grice, is a resident of the city and county of Dallas, state of Texas; that he is a citizen of the United States, and is unlawfully restrained of his liberty by John W. Baker, sheriff of McLennan county, Texas, by virtue of a capias issued out of the district court of the 54th judicial district of the state of Texas, at Waco, upon an indictment preferred in the said court against him and other citizens of the United States on the 21st day of November, 1894 (No. 871), and entitled "The State of Texas vs. John D. Rockefeller and others." Said indictment charges that John D. Rockefeller, Henry M. Flagler, John D. Archbold, Benjamin Brewster, Henry H. Rogers, Westley H. Tilford, Henry Clay Pierce, Arthur M. Finley, C. M. Adams, J. P. Gruett, E. Wells, Wm. Grice, F. A. Austin, and E. T. Hathaway, did unlawfully agree, combine, conspire, confederate, and engage with Wm. E. Hawkins and divers other persons, to the grand jurors unknown, in McLennan county, Texas, in a conspiracy against trade, with the said Wm. E. Hawkins, and said other persons, creating a trust, by the combination of their capital, skill, and acts with the said Wm. E. Hawkins and other persons, for the purpose, design, and effect to create and carry out restrictions in trade. That said indictment and prosecution has for its exclusive and only basis a certain act of the legislature of the state of Texas entitled "An act to define trusts, and to provide penalties and punishment of corporations, firms and associations of persons connected with them, and to promote free competition in the state of Texas," approved March 30, 1889, which act is a public law of the state of Texas. That petitioner was arrested upon a capias issued under said indictment, and entered into recognizance for his appearance, and subsequently appeared, on the 2d day of December, 1895, before the said court; and, said cause having been called for trial, the defendants who had been arrested announced a severance, and his co-defendant E. T. Hathaway was then placed

on trial, and by his counsel presented to said court his exceptions to the sufficiency of said indictment, and set up the following causes and exceptions to said indictment, to wit: (1) Because it did not appear from the face of the indictment that an offense against the law had been committed. (2) Because the indictment showed upon its face that the district court of the 54th judicial district had no jurisdiction. (3) Because the act hereinbefore recited was violative of the constitution of the United States, for the reason that said statute discriminated between different classes of citizens of the United States, and denied to certain citizens the equal protection of the law, and proposed to deprive certain citizens of the United States of their liberty, property, privileges, and immunities in a way other than by due course of the law of the land. (4) Because the act of March 30, 1889, was inoperative and void as to persons and citizens resident beyond the territorial limits of Texas. (5) Because said act did not prohibit a trust, or declare it illegal, nor did it declare it an offense, or propose to punish it, but merely defined a trust, without denouncing it, and was therefore not a penal law of the state of Texas, and no prosecution could be maintained under it. (6) Because said indictment showed upon its face that the parties presented were engaged in interstate commerce, within the meaning of the constitution and laws of the United States, and said court had no jurisdiction of any of such matters. Said district court overruled the above objections. The trial proceeded, and on the 12th day of December, 1895, resulted in a verdict of guilty, of the said co-defendant Hathaway, and assessed his punishment at a fine of $50, and judgment was duly entered thereon by the court. That on the 14th day of December, 1895, said co-defendant Hathaway filed his motions for new trial and in arrest of judgment, setting up, among other things, the error of the said court in overruling the exceptions above stated, which motion was overruled on December 16, 1895; and said co-defendant did thereupon prosecute his appeal to the court of criminal appeals of the said state of Texas; said last-named court having final jurisdiction of criminal matters in Texas, and being a court of last resort in said state, to hear and determine the questions therein raised. That under the provisions of the Code of Criminal Procedure of the State of Texas, and the act aforesaid of 1889, said conviction was a felony, and the said Hathaway was subjected to confinement in the common jail of McLennan county, Texas, pending the determination of said appeal. The petition further avers that the appeal of the said co-defendant Hathaway was filed in the said court of criminal appeals at Dallas on or about the 10th day of January, 1896, and on or about the 29th day of the same month said appeal was argued by counsel, both for himself, as appellant, and counsel for the state, and was submitted to the said court for determination. That upon the 24th day of June, 1896, said court of criminal appeals handed down its decision in said cause, wherein it declined and refused to pass upon the exceptions to the sufficiency of the indictment aforesaid, which had been duly raised in the court below, and duly presented to said court by assignment of errors and by argument, and which involved the dearest rights, not only of the said co-defendant Hathaway, who was appellant therein, but of this petitioner, and which appeal called for an adjudication by said court of criminal appeals of the said state of Texas upon said rights. That the said court of criminal appeals decided said appeal upon a technical ground of the pleadings; holding, in effect, that because the indictment presented in said cause had failed to charge the appellant Hathaway with having "knowingly carried out, as agent, the stipulations, purposes, prices, rates, or orders" under said alleged conspiracy, that thereafter the admission of evidence to that effect over the objection of said Hathaway was unwarranted in law, and said conviction was invalid; and thereupon, for said cause, and without considering and determining the rights of said appellant Hathaway as a citizen of the United States under the constitution, said court reversed said judgment, and remanded said cause, for trial de novo, to said district court. 36 S. W. 465. That, since the rendition of said judgment by said court of criminal appeals, two terms of the said district court have been held, one of which is now nearing its close. That this petitioner with his co-defendants have been arrested and placed under recognizance, have stood ready and anxious for trial upon said indictment, yet said cause has not been even called by the court for trial, nor has said cause been set for trial, but same has been

permitted to remain on the docket of said court, subjecting this petitioner and his co-defendants, wantonly, to the shame and contumely of an indictment for felony, but denying him and his co-defendants the rights to be heard as a citizen of the United States; and whereby the petitioner as well as his co-defendants are without remedy in the state courts of Texas for the assertion and vindication of their rights under the constitution of the United States. And petitioner further states that on the 24th day of November, 1896, said co-defendant E. T. Hathaway procured from this court his writ of habeas corpus, commanding said John W. Baker, sheriff of McLennan county, to produce before it the body of the said Hathaway and certify to the cause of his detention, which writ was on the same day duly served on the said sheriff, who made return that he held said Hathaway by virtue of a capias issued under the indictment hereinbefore mentioned. Said cause was set for hearing on the 7th day of December, 1896, at Waco, Texas, and due notice thereof given to the state. That said writ was based exclusively upon the gr. and that he was a citizen of the United States, and that the law under which said indictment had been presented was violative of the constitution of the United States in the particulars stated in his exceptions thereto filed upon the trial of the said cause. That petitioner further shows that the prosecuting officer of the state of Texas in the district aforesaid, as petitioner believes, for the purpose of defeating the jurisdiction of the federal court upon the said writ, and for the purpose of preventing this court from passing upon the constitutionality of the rights of the said E. T. Hathaway as a citizen of the United States, did on the 7th day of December, 1896, in said district court, and with the consent of said court, dismiss said indictment and prosecution as to said E. T. Hathaway, co-defendant, but left same to stand unimpaired and unaffected as to this defendant and his other co-defendants; and upon the same day the said sheriff did file his amended return to said writ, wherein he submitted to this court a copy of said judgment of dismissal of the said district court of the state of Texas, and did further certify that by reason of said dismissal he claimed no further right and custody of the said Hathaway; and by reason thereof the jurisdiction of this court in the premises was practically and substantially terminated, and this court was denied the privilege of determining whether or not said act of the legislature of the state of Texas approved March 30, 1889, commonly known as the "Anti-Trust Act," was or was not violative of the constitution of the United States, and violative of the rights, privileges, and immunities of your petitioner, as well as his co-defendants. The petition further avers that said act is violative of the constitution of the United States, and is therefore null and of no effect, for the reasons stated in said exceptions to said indictment hereinbefore recited. That said act discriminates between different classes of citizens of the United States, and denies to certain citizens the equal protection of the laws. That it deprives certain citizens and classes of citizens of the United States of their liberty, property, privileges, and immunities in a way other than by due course of the law of the land. That it otherwise attempts to justify the exercise of extraterritorial jurisdiction over the citizens of the United States residing in other states of the American Union, and over acts done in other states of the American Union, and over which the state of Texas can have no possible jurisdiction. And that said act, and the indictment against your petitioner and others as aforesaid, is an attempt to regulate and interfere with interstate commerce, all in violation of the constitution of the United States. The petitioner further shows that, by reason of the premises, he is without remedy for the assertion and vindication of his rights as a citizen of the United States, under the constitution thereof; that he has stood under indictment for felony, charged with the violation of said statute, for a period of two years, without being afforded an opportunity by the state courts of Texas for the assertion of his rights as aforesaid as a citizen of the United States. Your petitioner avers and believes that it is the purpose and intent of the prosecuting authorities of the state of Texas to prevent, if possible, any appeal by this petitioner to the courts of the United States for the vindication of his rights as aforesaid as a citizen. In view of the premises herein recited, and without the interposition of this honorable court for his due protection and the due conservation of his rights as a citizen of the United States, he is practically remediless by an appeal in regular course, or other-

wise. Upon the said premises, the petitioner prays this court for its writ of habeas corpus, to the end that the cause of the detention of the petitioner may be promptly and summarily inquired into by this court according to the laws of the United States, in order to direct the discharge of this petitioner from the custody of said Baker, sheriff, as aforesaid.

### The petitioner filed with his petition his exhibits as follows:

(1) Copy of indictment preferred in said cause against your petitioner and others. (2) Copy of judgment of the district court of the 54th judicial district, adjudging his co-defendant Hathaway guilty. (3) A copy of the brief and argument of your petitioner's co-defendant Hathaway in the court of criminal appeals of the state of Texas. (4) A copy of the opinion of the said court of criminal appeals of the state of Texas. (5) And petitioner refers to the record of this court in matter of the application of Ex parte E. T. Hathaway, and prays that it may be considered a part and parcel of this petition. And your petitioner prays that these papers filed herewith may be read and considered by the court upon final hearing hereof; also, as a part of this, his petition for habeas corpus. And, as in duty bound, your petitioner will ever pray.·

Said petition was duly sworn to by the said petitioner, William Grice, upon the 9th day of December, 1896, in the presence of Thomas P. Stone, a notary public for McLennan county, Tex. As to the papers filed with and made a part of this petition, the indictment contains six counts, and covers every phase and feature of the said act under which it is drawn. The judgment of the district court of the Fifty-Fourth judicial district of the state of Texas follows the verdict therein. A copy of the brief and argument of petitioner Hathaway in the court of criminal appeals of the state contains the usual matters embodied in such a brief, including the rulings of the trial judge, together with the opening argument of counsel for the state, made at the trial. The copy of the opinion of the said court of criminal appeals of the state of Texas, showing that the court decided:

(1) The judgment is reversed and the cause remanded because the court charged on a phase of the case not supported by any allegation in the indictment, and because the evidence wholly fails to sustain this verdict. (2) That the decision of the constitutional questions raised by appellant Hathaway was not necessary in that case. (3) That the presumption would be indulged that the decision of the supreme court of the state of Texas sustaining the con-· stitutionality of said act was correct.

The petition of E. T. Hathaway for habeas corpus, and the return and amended return of the sheriff thereof, shows substantially the facts as alleged above.

Upon said petition and exhibits being filed, this court on December 9, 1896, granted the writ of habeas corpus prayed for, which was duly served on the same day upon John W. Baker, sheriff of McLennan county, Tex., who upon the same day produced in open court, as directed, the said William Grice, and answered that he held him in custody by virtue of a capias issued out of the district court of the Fifty-Fourth judicial district of the state of Texas upon an indictment (No. 871) entitled "The State of Texas vs. John D. Rockefeller et al." Said indictment charged said parties with having engaged in a conspiracy against trade, in violation of the act of the legislature of the state of Texas entitled "An act to define trusts," etc. On the 11th day of January, 1897, said sheriff of McLennan

county filed his amended return herein, in which he set up, in addition to the facts contained in his former return, that the authorities of the state of Texas have at all times been vigilant and diligent in the discharge of their duties towards this relator and his co-defendants; that they have been anxious and ready to accord them a speedy trial, and that the delay in the trial came, in a great part, from their own seeking; and that the docket entries of said court would show that the cause was continued twice, at their special request, before proceeding with the trial in December, 1895. And the amended answer further charges that it was the avowed purpose of the relator and his co-defendants to delay and defeat the jurisdiction of the state courts in their case, by having their sureties surrender them in order that this writ of habeas corpus might be sued out. And said sheriff prays that the relator herein be remanded to his custody. To which amended answer, relator on the same day replied that the delay complained of in his trial was that which occurred subsequent to the 2d day of December, 1895; and denied the allegations that he and his co-defendants had conspired to defeat the jurisdiction of the courts of the state of Texas; and demurred to so much of said amended answer as referred to relator and his co-defendants having procured their sureties to surrender them to the sheriff, because such allegations, if true, are no justification of the detention of this relator, and furnish no answer to the allegations of his petition; and prays judgment therein. At the hearing, petitioner also filed in evidence the certificate of the secretary of the interior, by George S. Donald, chief of census division of the United States, showing the number of farmers, planters, overseers, and agricultural laborers, stock raisers, herders, and drovers, and other laborers not specified, within the state of Texas, according to the census returns of 1890.

Upon the said petition and exhibits, answer and amended answer, and replication thereto, hearing was had.

First, as to petitioner's demurrer to plaintiff's plea that he was in the hands of the sheriff by collusion with his sureties at the time of the suing out of the writ of habeas corpus, the court thinks the demurrer should be sustained. While it was early decided in Respublica v. Arnold, 3 Yeates, 263, that the law authorizing the issuance of a writ of habeas corpus did not apply to a person out on bail, and could not be directed to the bail of an offender; and in Wales v. Whitney, 114 U. S. 564, 5 Sup. Ct. 1050, that, in order to make a case for habeas corpus, there must be actual confinement, or the present means of enforcing it, mere moral restraint not being sufficient; also, in the case in 6 Mart. (La.) 569 (Dodge's Case), and Rex v. Kessel, 1 Burrows, 638, by Lord Mansfield, to the same effect,—yet it has been held in Taylor v. Taintor, 16 Wall. 366, that: When bail is given the principal is regarded as delivered to the custody of his sureties, and their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him, and deliver him up in their discharge, and, if that cannot be done at once, they may imprison him until it can be done. The seizure is not made by virtue of new process; none is needed. The bail have

their principal on a string, and may pull the string whenever they please to surrender him in their discharge. In the case of Devine v. State, 5 Sneed, 625, the court, speaking of the principal, say:

"The sureties had the control of his person. They were bound to keep him within their jurisdiction, and have his person ready to surrender when demanded. Though beyond the jurisdiction of Connecticut, he was still in the hands of the law of that state, and held to answer there for the offense with which he was charged."

But the petitioner here was in the custody of the officer. He so answers in his return, and his answer must be taken as true. The petitioner had the perfect right, when first arrested, to refuse to give bail. His sureties had an equal right to surrender him to the state, after it was given, for any cause whatever, and it is not within the province of the respondent to question the purpose in either case. The court is of the opinion that he had the right to do either one or the other, for the purpose of testing the constitutionality of the law under a writ of habeas corpus, when all the facts of this case are considered.

Two principal questions remain: First, the right of this court to take jurisdiction of this case; second, the constitutionality of the law.

The court is not inclined to question the contention of the principles laid down by the state, as embodied in the decisions cited by its representatives on the first point, to wit, that the general rule is that parties being prosecuted in state courts will not be released on writs of habeas corpus, but will be left to reach the supreme court of the United States by writ of error. This rule is abundantly sustained by numerous decisions cited, and is scarcely questioned by the relator himself. But it is equally as well established by the same references that the federal court has the power to do so, if special circumstances should require; that it possesses a discretion in the matter which must be governed by the facts in each case. A brief review of a few of the cases cited will establish the above principle. In the leading case of Ex parte Royall, 117 U. S. 241, 6 Sup. Ct. 734, Justice Harlan, speaking for the court, while refusing to reverse the exercise of the discretion of the circuit court, affirms the power of the federal courts to issue writs of habeas corpus of prisoners held by the states, and on page 248, 117 U. S., and page 738, 6 Sup. Ct., in that case, says:

"The statute evidently contemplated that cases might arise when the power thus conferred should be exercised during the progress of the proceedings instituted against the petitioner in a state court, or by or under authority of a state, on account of the very matter presented for determination by the writ of habeas corpus."

And on pages 249 and 250, 117 U. S., and page 739, 6 Sup. Ct.:

"We are therefore of opinion that the circuit court has jurisdiction, upon writs of habeas corpus, to inquire into the cause of the appellant's commitment, and to discharge him, if he be held in violation of the constitution."

But adds:

"As it does not appear that the circuit court might not, in its discretion, and consistently with the law and justice, have denied the applications for the writ at the time they were made, we are of the opinion that the judgment in

each case must be affirmed, but without prejudice to the right of the petitioner to renew his application to that court at some future time, should the circumstances render it proper to do so."

In Re Wood, 140 U. S. 278, 11 Sup. Ct. 738, the court refuses to review the exercise of the discretion of the circuit court in refusing to grant a writ of habeas corpus, but affirms the doctrine of the authority to grant such writ. In Cook v. Hart, 146 U. S. 183, 13 Sup. Ct. 40, the above doctrine is affirmed in the following language:

"We are unable to see in this case any such special circumstances as were suggested in the case of Ex parte Royall as rendering it proper for a federal court to interpose before the trial of the case in the state court. While the power to issue writs of habeas corpus to state courts which are proceeding in disregard of rights secured by the constitution and laws of the United States may exist, the practice of exercising such a power before the question has been raised or determined in the state courts is one which ought not to be encouraged. Should such rights be denied, his remedy in the federal court will remain unimpaired."

Mr. Justice Jackson, speaking for the court in Re Frederich, 149 U. S. 73, 13 Sup. Ct. 795, says:

"While the writ of habeas corpus is one of the remedies for the enforcement of the right of personal freedom, it will not issue as a matter of course, and it should be cautiously used by the federal courts in reference to state prisoners. Being a civil process, it cannot be converted into a remedy for the correction of mere errors of judgment or of procedure in the court having cognizance of the criminal offense."

He affirms, however, the power of the federal court to grant such writ, in certain cases, in advance of the trial, but says that that discretion should be subordinate to any special circumstances requiring immediate action; and, when the state courts shall have finally acted upon the case, the circuit court has still a discretion whether, under all the circumstances existing, the accused, if convicted, shall be put to his writ of error from the highest court of the state, or whether it will proceed, by writ of habeas corpus, summarily to determine whether the petitioner is restrained of his liberty in violation of the constitution of the United States.

In New York v. Eno, 155 U. S. 90, 15 Sup. Ct. 30, it is decided that the United States should refuse to issue writ of habeas corpus unless it also appears that the case is one of urgency. When the claim of the accused of immunity from prosecution in the state court has been passed upon by the highest court of the state of New York in which it could be determined, he may then, if the final judgment of that court be adverse to him, invoke the jurisdiction of this court for his protection in respect to any federal rights asserted by him, but this may be denied by such judgment.

In Re Belt, 159 U. S. 100, 15 Sup. Ct. 988, Chief Justice Fuller, speaking for the court, says:

"Ordinarily the writ will not lie where there is a remedy by writ of error or appeal, but in rare and exceptional cases it may be issued, although such remedy exists."

In Re Swan, 150 U. S. 648, 14 Sup. Ct. 228, the same judge, delivering the opinion for the court, says:

"We reiterate what has so often been said before, that the writ of habeas corpus cannot be used to perform the office of writ of error or appeal; but when

no writ of error or appeal will lie, if a petitioner is imprisoned, or under a judgment of the circuit court which has no jurisdiction of the person or of the subject-matter, or authority to render the judgment complained of, then relief may be accorded,"—citing In re Frederich, 149 U. S. 70, 13 Sup. Ct. 793, and In re Tyler, 149 U. S. 164, 13 Sup. Ct. 785.

The above cases not only establish the general rule insisted upon by the state, but also the exceptions thereto, and refute the argument made by the state that the only exceptions to that rule were stated in Whitten v. Tomlinson, 160 U. S. 243, 16 Sup. Ct. 297.

It is insisted by the state that this is a case where the relator stands indicted in the ordinary way in the state court, and before trial, in which his rights have not been determined, and that, therefore, under the general rule referred to above in regard to the jurisdiction of the federal court and the exercise of its discretion, it will not take jurisdiction of the case. What are the facts that this court is called upon to consider on this question of jurisdiction? First, that the petitioner is indicted under this "anti-trust law" in the same indictment with more than a dozen others, some of whom are charged with the commission of crimes in other states than that of Texas. That one of the petitioner's co-defendants has been tried and convicted in the district court of the Fifty-Fourth judicial district of Texas, and appealed his case to the court of last resort in said state, raising the questions of the constitutionality of the law and the jurisdiction of the state. That said court of last resort granted a new trial, and remanded the co-defendant, for the reason that there had been no testimony offered to sustain a verdict of guilty, and, while deciding it was unnecessary to pass upon the constitutional questions raised, referred favorably to decisions of the supreme court of the state in which the anti-trust law had been sustained in this regard. Said co-defendant was held by the said district court for nearly six months before the state discovered that it had no evidence upon which to hold him longer, and said discovery was only made after the writ of habeas corpus had issued from this court, and he had been brought in for the purpose of having the question of the constitutionality of said law determined. That since the trial of co-defendant Hathaway, in December, 1895, this petitioner has never been called for trial, nor given any chance to have his rights determined by said court. That the law in question makes an offense under it a felony, and prevents the petitioner from giving bond after conviction, and compels him to submit to incarceration during all the time required for an appeal to the court of criminal appeals, and from there to the supreme court of the United States, should it become necessary. These facts, taken together with the rulings of the trial judge in the Hathaway case, as well as the argument of counsel to the jury permitted therein for the state, constitute circumstances under which this court is called upon to exercise its discretion in assuming jurisdiction in a writ of habeas corpus. While the facts that might be produced in the state court on the trial of petitioner might be entirely different from those that the state was able to offer at the trial of Hathaway, judging from the record of the evidence and the rulings of the court, and the wild harangue permitted by the state's

representative to the jury in the name of argument, and the verdict that followed, this petitioner can expect little better results than Hathaway received in that court; yet the questions of law involved in the indictment, and the rights of all his co-defendants named therein, under the constitution of the United States, must necessarily be the same. And while it is to be presumed by this court that in the first instance the state court will decide the questions properly and according to law, yet, when this court has the evidence before it of the manner in which they have been decided in the Hathaway case, it is to be presumed that the same ruling would be given on the trial of this petitioner, especially when the ruling of the court of criminal appeals in remanding the prisoner, referring favorably to the decision of the supreme court of the state affirming the constitutionality of the law, would seem to indorse that portion of the trial judge's ruling in this regard. Petitioner makes no complaint of the delay occasioned by the state court of his trial prior to December, 1895, but alleges in his petition that he has had no opportunity since that time to have his case disposed of, which fact is not denied by the state. While the court of criminal appeals expressed it as unnecessary to pass upon the question of the constitutionality raised in the Hathaway appeal, yet, in remanding Hathaway for a new trial under the circumstances, it practically and emphatically indorsed the constitutionality of said law, and, that it might not be misunderstood as to its views on the subject, referred with favor to the decisions of the supreme court of Texas indorsing said law. By this decision of the court of criminal appeals, it not only decided that there was no testimony to sustain the verdict against Hathaway, but intimated that the allegations of the indictment were not such as to admit the testimony, if it had been present. Under this suggestion, is it not strange that the state did not discover for six months that they possessed no testimony with which to convict him, and that discovery was not made until after the federal court had granted its writ of habeas corpus, and had the matter of the constitutionality of the anti-trust law set down for hearing? So far as the legal and constitutional questions are concerned, the trial of Hathaway was the trial of this petitioner, and whatever rights he has under the constitution of the United States under this indictment have already been disposed of against him by the state in a court of last resort. But, further than this, it has been disposed of in a manner which not only prevents Hathaway from coming to this court to get his constitutional rights determined, but, if the state's theory is correct, will prevent this petitioner and every other of his co-defendants so held under bond from getting any relief until they have submitted themselves to a trial and appeal to the court of criminal appeals, with the certainty of having the constitutional questions determined against them, in the way that they have already been; and, if there should appear evidence on which to hold them, then each of them must go to the supreme court of the United States pending a writ of error, and remain incarcerated in a jail of Texas during all this time while their rights are being thus determined. The court has no better

language in which to express its views of the state's contention herein than that given by Brewer, J., in Ex parte Kieffer, 40 Fed. 400, as follows:

"Therefore it is often the proper way to decline to allow the writ, leaving the party to enforce his rights in the state courts. So it is argued that, if it be true that these ordinances are in conflict with the federal constitution, the petitioner has his remedy. He can appeal his case from the police to the district court, from there to the supreme court of the state, and thence to the supreme court of the United States. While that is true, yet he has no adequate relief in that way. He is now under sentence, and he cannot appeal without bond. He will be subjected to trial in the district court, possibly to an inquiry in the supreme court of the state, and finally in the supreme court of the United States. He must bear the expense and suffer the delay. This is not a case prior to trial and judgment. It is a case after trial and after judgment. He has experimented with the state court, and it has decided against him. While he has, of course, the right to appeal, yet this is a burden, and personally to him it is an inadequate protection to say, 'You can appeal and go through that channel to the supreme court of the United States.' But that is not the only consideration. If these ordinances are invalid, they are invalid because of an attempt to interfere with commerce, and prevent the free exchange of commodities between citizens of another state and those of this city. Few persons can stand the expense of litigation running through that channel to the supreme court. Length of time would pass before the judgment of that court could be obtained. In the meantime, if these ordinances are enforced,—not only against this petitioner, but against whoever may see fit to engage in this business,— there is an interference with exchange of commodities between the citizens of other states and those of this city, and the result would be to stop such traffic. Now, when that would be the natural result, when that is declared to be the intended purpose of this legislation, this court may, in the exercise of its discretion, properly hold, after a case has passed to judgment in the state court, that the party has a right to a speedy inquiry and determination in the federal court as to whether such ordinances are in conflict with the constitution of the United States. The public as well as the individual are interested in a speedy settlement of this matter."

The act in question, of March 30, 1889, of the state of Texas, is as follows:

"1. A trust is a combination of capital, skill, or acts by two or more persons, firms, corporations or associations of persons, or of either two or more of them, for either, any, or all of the following purposes: First, to create or carry out restrictions in trade; second, to limit or reduce the production, or increase or reduce the price of merchandise or commodities; third, to prevent competition in manufacture, making, transportation, sale or purchase of merchandise, produce or commodities; fourth, to fix at any standard or figure whereby its price to the public shall be in any manner controlled or established, any article or commodity of merchandise, produce, or commerce intended for sale, use, or consumption in this state; fifth, to make or enter into, or carry out or execute any contract, obligation, or agreement of any kind or description, by which they shall bind or have bound themselves not to sell, dispose of, or transport any article or commodity or article of trade, use, merchandise, commerce, or consumption, below a common, standard figure, or by which they shall agree in any manner to keep the price of such article, commodity, or transportation at a fixed or graduated figure, or by which they shall in any manner establish or settle the price of any article, or commodity, or transportation between themselves and others, to preclude a free and unrestricted competition, among themselves or others, in the sale or transportation of any such article or commodity, or by which they shall agree to pool, combine, or unite any interest that they may have in connection with the sale or transportation of any such article or commodity that its price might in any manner be affected."

"6. Any violation of either or all of the provisions of this act shall be, and is hereby declared a conspiracy against trade, and any person who may be, or may become engaged in any such conspiracy, or take part therein, or aid

or advise in its commission, or who shall, as principal, manager, director, agent, servant or employé, or in any other capacity, knowingly carry out any of the stipulations, purposes, prices, rates or orders thereunder, or in pursuance thereof shall be punished by fine, not less than fifty dollars, nor more than five thousand dollars, and by imprisonment in the penitentiary, not less than one, nor more than ten years, or by either such fine or imprisonment. Each day during a violation of this provision, shall constitute a separate offense.

"7. In any indictment for an offense named in this act, it is sufficient to state the purposes or effects of the trust or combination, and that the accused was a member of, acted with, or in pursuance of it, without giving its name or description, or how, when or where it was created.

"8. In prosecutions under this act, it shall be sufficient to prove that a trust or combination, as defined herein, exists, and that the defendant belonged to it or acted for, or in connection with it, without proving all the members belonged to it, or proving or producing any article of agreement or any written instrument on which it may have been based, or that it was evidenced by any written instrument at all. The character of the trust or combination alleged, may be established by proof of its general reputation as such.

"9. Persons out of the state may commit and be liable to indictment and conviction for committing any of the offenses enumerated in this act, which do not in their commission, necessarily require a personal presence in this state, the object being to reach and punish all persons offending against its provisions, whether within or without the state.

"10. Each and every firm, person, corporation or association of persons, who shall in any manner violate any of the provisions of this act, shall, for each and every day that such violation shall be committed or continued, forfeit and pay the sum of fifty dollars, which may be recovered in the name of the state of Texas, in any county where the offense is committed, or where either of the offenders reside, or in Travis county. And it shall be the duty of the attorney general or the district or county attorney, to prosecute for and recover the same."

"12. The provisions hereof shall be held cumulative of each other, and of all other laws in any way affecting them now in force in this state.

"13. The provision of this act shall not apply to agricultural products or live stock while in the hands of the producer or raiser."

That portion of the fourteenth amendment of the constitution of the United States referred to in the argument is the latter part of section 1, and is as follows:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, or deny to any person within its jurisdiction the equal protection of the law."

While the objection of the petitioner to the act in question, that it is invalid and inoperative as a penal enactment, by reason of its failure to prohibit trusts and declare them illegal, and because of the further failure of said act to declare or propose any punishment, may be well taken in that strict construction required for criminal statutes, yet this objection, if good, can readily be remedied by the legislature; and the supreme court of the state have, in some of their decisions, read into it the intention of the legislature to complete its meaning. It were perhaps better to pass this objection without further comment, in view of the fact that it is not the vital, constitutional question before the court. The fifth paragraph of the said act, in which it is attempted to claim jurisdiction for offenses committed outside of the state of Texas, is so absurd that a denial thereof is scarcely necessary. It has been decided in emphatic language by Chief Justice Taney, in U. S. v. Booth, 21 How. 524, as follows:

"No judicial process, whatever form it may assume, can have any lawful authority outside of the limits of the jurisdiction of the court or judge by whom it is issued, and an attempt to enforce it beyond these boundaries is nothing less than lawless violence."

This principle is elementary, and not only common law, but the commonest of common sense.

It has been properly suggested that, should this feature of this act be carried out and administered, it would be unnecessary for any other state or the nation at large to have any other laws upon the subject, as all persons within the limits of the United States could be regulated in their dealings and in the conduct of their business according to the wishes of the legislature of Texas. The state, in its criminal jurisdiction as to acts committed within its own boundaries, and within the limits prescribed by the federal constitution, is sovereign, and its process should not be interfered with where it does not contravene the said constitution; but, beyond the boundaries of the state, it has no more authority in New York, Missouri, or Ohio than it has in Great Britain or Austria, and that part of the act which proposes this extraterritorial jurisdiction is absolutely null and void. But, under some of the decisions, we think it may properly be contended that paragraph 5 of this act can be omitted as unconstitutional without affecting the remainder.

The vital question, and the most important in this case, remains: Whether or not the said act violates that portion of the fourteenth amendment to the constitution of the United States above referred to, in that it deprives its citizens of liberty and property without due process of law; and, second, it denies to a considerable number of its citizens the equal protection of the law. This is not a question of the right of taxation, nor is it a question of police power of the state to suppress or regulate nuisances or control the liquor traffic, foreign or domestic. But the two plain questions squarely raised are: First, can the state of Texas prohibit all contracts, of whatever character or nature, among its citizens, when they tend to contravene the intended prohibition of the act? And, second, if they can do so, is it class legislation to exempt 80 per cent. of the whole population from the pains and penalties of the said act, when dealing with the agricultural products or live stock in the hands of the producer or raiser? These are the two vital questions involved in this case.

In regard to the first proposition, the complainant contends that the act is violative of the fourteenth amendment to the constitution of the United States, because it denies to citizens of the United States the right to make valid contracts with respect to their business and property, and deprives them of the right of their property in that respect, as well as liberty, without due process of law. Some difficulty has been expressed by courts in finding the exact and specific definition of the expressions "due process of law," and the "law of the land." The constitution itself declares:

"This constitution, and laws of the United States which shall be passed in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding."

The supreme court, in speaking of "due process of law" and "equality of citizens," said that the purpose of the requirement is to exclude everything that is arbitrary, affecting the rights of citizens. Dent v. West Virginia, 129 U. S. 124, 9 Sup. Ct. 234. Says the court in Live-Stock Dealers' & Butchers' Ass'n v. Crescent City Live-Stock Landing & Slaughterhouse Co., 1 Abb. (U. S.) 399, Fed. Cas. No. 8,408:

"No proposition is more firmly settled than that it is one of the fundamental rights and privileges of every American citizen to adopt and follow such lawful and industrial pursuits, not injurious to the community, as he may see fit, without unreasonable regulation or molestation. There is no more sacred right to citizenship than the right to pursue any lawful employment in a lawful manner. It is nothing more nor less than the sacred right of labor."

The same sentiment is affirmed in the Slaughterhouse Cases, 16 Wall. 36, and other decisions.

It is not necessary to argue that the constitutional privileges which protect the citizen in his life, liberty, or property entitle him to raise, produce, and manufacture articles of general use; buy and sell; to fix and limit the amount of any article which he will produce or manufacture; to increase or reduce the amount so produced or manufactured at his own will, within the limits of his ability; to fix and limit the price at which he will buy and sell; to bargain and agree with others upon prices, so far as it may be necessary in the business of buying and selling; in fact, to do anything and enter into all contracts usual and necessary in the ordinary avocations of production, manufacture, and trade. Neither the state nor the national legislature possesses any right to limit these natural privileges of contracting or conducting business. Any law which undertakes to abolish these rights, the exercise of which does not involve infringement upon the rights of others, or to limit the exercise thereof beyond what is necessary to provide for the public welfare and general security, cannot be included in the police power of the government. "The right of liberty embraces the right of man to exercise his faculties and follow any lawful avocation for the support of life." Bertholf v. O'Reilly, 74 N. Y. 515. "Liberty," in its broad sense, as understood in this country, means the right not only of freedom from servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation. People v. Marx, 99 N. Y. 377, 2 N. E. 29; People v. Gillson, 109 N. Y. 389, 17 N. E. 343. "The legislature cannot, under the pretense of exercising the police power, or under any other claim or pretense, enact laws prohibiting harmless acts not concerning the health, safety, or welfare of society, and the courts may examine into and annul such illegal legislation." Toledo, W. & W. Ry. Co. v. City of Jacksonville, 67 Ill. 37; Hey Sing Ieck v. Anderson, 57 Cal. 251. "Whenever the prosecution of a particular calling threatens damage to the public or to other individuals, it is a legitimate subject for police regulation, to the extent of preventing the evil, but it is strictly a judicial question whether the trade or calling is of such a nature as to require or justify police regulation." Town of Lakeview v. Rose Hill Cemetery Co., 70 Ill. 192. It is also a judicial question

whether police regulation extends beyond the threatened evil, and prohibits that which involves no threatened danger to the public. One of the most sacred rights of liberty is the right of contract. All of the rights of contract which are necessary for the carrying on of ordinary business affairs are protected by the constitution, and are not capable of being restrained by legislative action. Among these rights is that of forming business relations between man and man. A man may form business relations with whom he pleases, and in the conduct of such business they may fix and limit the character and amount of their business, the price they will charge for the produce which they offer to the public, or about which they contract. "It is part of the natural and civil liberty to form business relations free from the dictation of the state; that a like freedom should be secured and enjoyed in determining the conditions and terms of the contract which constitutes the base of the business relation or transaction. It is therefore the general rule that a man is free to ask for his wares or his services whatever price he is able to get and others are willing to pay." Tied. Lim. Police Power, p. 233. And on page 244 he says: "A man has a constitutional right to buy anything, in any quantity, provided he uses only fair means, and set his own price on it, or refuse to sell it at all. And what one man may lawfully do as an individual, two or more may also do when combined as partners. Combination for business purposes is legal. Combinations are beneficial as well as injurious, according to the motives and aims with which they are formed. It is therefore impossible to prohibit all combinations. The prohibition must rest upon the objectionable character of the object of the combination." "If there is one thing more than another public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice. Therefore you have this paramount public policy to consider,—that you are not lightly to interfere with this freedom of contract." Registering Co. v. Sampson, L. R. 19 Eq. 462; Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. 419; United States Chemical Co. v. Provident Chemical Co., 64 Fed. 946.

From the title of the act, "Conspiracies against Trade," and "Trusts," as well as from the argument for the state, it would seem to be the impression that the act was intended only to prevent oppressive and unreasonable combinations. There is no such limit, however, within its four corners. It embraces the combination of two or more persons; consequently, the partnership of two persons. Neither is there any limitation to the amount of capital combined with skill and acts. A small capital, with a minimum of skill, is as much prohibited as the largest amount. We are not permitted to read any such explanation into it, but must take it as the legislature furnished it, and with such construction as the rules of law put upon it. The courts have no more power to exclude what is embraced in it than to include what is not contained in the plain language of the act. Then it is declared that the prohibited com-

79 F.—41

binations must be for one or more certain specified purposes, as follows: To create or carry out restrictions in trade; to limit or reduce the production of commodities; to increase the price of commodities; to reduce the price of commodities; to prevent competition in the manufacture, sale, etc.; to fix the price of any article at a standard or figure whereby its price to the public shall be in any manner controlled or established. It makes criminal the making or carrying out of any contract, obligation, or agreement by which two or more persons, firms, or corporations combine themselves not to sell any article below a standard or common figure; to keep the price of such article at a fixed or graduated price; to settle the price of any article between themselves and others; to exclude all free and unrestricted competition among themselves and others; to pool, combine, or unite any interest they may have in connection with the sale and transportation of any article when its price might in any manner be affected. An agreement between two or more persons forms a combination between them. An agreement between two or more persons is made as criminal as an agreement between a hundred. No attempt is made to condemn only acts which are oppressive by reason of their magnitude. It is evident that it is made criminal for two persons to combine, as partners, corporators, or otherwise, in the ordinary business of life, to increase or reduce the price of commodities, or fix the standard thereof. Next, it is also made criminal for two persons to agree to limit or reduce the production of commodities. It is made criminal for two persons to combine for the purpose of limiting competition, or to make any agreement in relation to the price of an article, so as to preclude free and unrestricted competition between them or themselves and others. It is made criminal for two persons to create or carry out restrictions in trade. We will assume that A. and B. agree to combine their capital, skill, and acts, or, in other words, enter into partnership, for the purpose of manufacturing and dealing in certain commodities. They must first necessarily determine the extent of their production, and the price at which they can sell their commodities. Having determined as near as possible the costs of their manufactured products, and the minimum profit necessary to justify the carrying on of the business, they agree that they will not sell their commodities below this common standard figure. They fix a figure on which they commence their sales, agreeing to graduate the price up or down as the cost of production may vary. Finding, after a time, their prices too high, and that competitors are underselling their commodities, they lower their prices, and this they may do solely for the purpose of holding the market against competitors. There may be, after a time, an increase in wages, and they agree to increase their prices. There comes an era of hard times. Their stock accumulates and is unsalable, and they agree to limit or reduce the production of their commodities. All this they must be able to do, or they cannot carry on their business as partners, yet every one of these agreements, arrangements, undertakings, or acts are made criminal by this act. It is absolutely impossible to carry on a part-

nership business without violating it. If persons combined cannot carry on business without entering into, executing, and carrying out contracts, obligations, and agreements by which they shall settle the prices of any article, as between themselves or themselves and others, and bind themselves to sell their commodities at a figure or graduated figure, and not to sell below a common standard figure, or if they cannot carry on business without raising and lowering prices and increasing and diminishing their productions at pleasure, then certainly all these things are purposes of their combination. Whether these are the main purposes, or purposes essential to the main purposes, is not of the slightest consequence. The right to combine, to form partnerships and joint stock associations; the right to agree as to prices and productions; the right to fix prices, to raise and lower them as business men may require,—is not oppressive to the public, nor unjust to the individual, nor contrary to public policy. It is an essential right, as part of the liberty of the citizen, of which no legislature can deprive him. If an ordinary business partnership is rendered criminal by the act, no further argument is necessary. That it is so most clearly appears from the concluding portion of section 1, by which two or more persons are forbidden to unite any interest that they may have in connection with the sale or transportation of any article or commodity that its price might in any manner be affected. Two village grocers doing business at a loss to both could not form a partnership in order to save both from bankruptcy. Neither could they form a partnership in order that they might lessen their expenses, and thus reduce the price of their commodities to the public. Still more, if A. and B., each owning half a car load of potatoes, should agree to ship together, in order to obtain car-load rates, thus enabling them to sell lower in the markets, they would violate this act. Not only, under this act, is it impossible for citizens to enter into the simplest partnership without violating it, but they cannot enter into a joint-stock association or corporation, for that precludes competition between those combined. And this forms so necessary a part of the daily business affairs of men that its prohibition would interfere with and prevent business as now conducted, and consequently to make that criminal is to interfere with the liberty of the citizen. The statute books contain laws authorizing and legalizing associations and corporations. Can it be that the same statute book which contains such laws can contain also a valid law inflicting severe penalties on those who do only that which the laws have authorized? The act also prohibits combinations which create or carry out restrictions in trade. It has never been held that all restrictions in trade were illegal or contrary to public policy. The rule is well settled that when a contract is publicly oppressive, and the restrictions broader than necessary for the legitimate protection of the other party to be benefited by the contract, then the contract is void; otherwise it is legal. The fault of the act in regard to restraint of trade is the same as in regard to competition. It makes no distinction between legal and illegal combinations and agreements which prevent competition. Those which have always been held legal, and

which have always been an essential part of the liberty of the citizen, are made criminal, equally with those which the law has always condemned.

A few citations showing the law as established by the federal courts, as compared with the Texas act, may be instructive in this connection. The case of U. S. v. Trans-Missouri Freight Ass'n will bear careful perusal in this connection. The opinion of Riner, district judge, is reported in 53 Fed. 441, and of Sanborn, circuit judge, in 7 C. C. A. 15, 58 Fed. 63. The argument in these opinions is to demonstrate that contracts which restrict competition are not necessarily in restraint of trade, and therefore not embraced in the federal act. The same arguments conclusively demonstrate that any laws preventing all contracts which prevent competition are infringements of the liberty of the citizen. After reviewing the cases which apparently condemn restrictions of competition, Judge Sanborn says (page 74, 7 C. C. A., and page 70, 58 Fed.):

"But in none of these cases were they required to hold, and in none of them did they hold, as we understand the opinions, when read in relation to the facts of the cases, respectively, that every restriction of competition by contracts of competing dealers or carriers was illegal."

The learned judge then cites a score of cases in which contracts in restriction of competition are held to be illegal, and sustaining his opinion:

"That it is not the existence of the restriction of competition, but the reasonableness of that restriction, that is the test of the validity of the contracts that are claimed to be in restraint of trade."

This case is followed in Dueber Watch-Case Manuf'g Co. v. E. Howard Watch & Clock Co., 14 C. C. A. 14, 66 Fed. 637:

"Excessive competition may sometimes result in actual injury to the public, and competitive contracts to avert personal ruin may be perfectly reasonable. It is only when such contracts are publicly oppressive that they become unreasonable, and are condemned as against public policy."

Also, Leslie v. Lorillard, 110 N. Y. 519, 18 N. E. 363, in which the court says:

"It does not think competition invariably a public benefaction, for it may be carried on to such a degree as to be an evil. It is perfectly legitimate to combine capital for all the mere purposes of trade for which capital may, apart from combination, be legitimately used in trade."

If this right to combine exists, the right to do ordinary business, such as fixing prices, changing prices, agreeing on productions, etc., must follow, and all these things constitute the liberty of the citizen. The vice of the act in question is that it attempts to prevent too much. It does not stop at reasonable limits. It is not content with making criminal general restraint of trade, but it makes criminal all restrictions of trade. It is not content with affixing penalties to acts or contracts which unreasonably restrict competition; it condemns any agreement or arrangement which prevents competition between two or more persons entering into it. It not only prevents competitors from oppressing the public by unreasonable agreements as to production and prices; it also prevents persons associated in interest, joint own-

ers and co-partners, from making any agreement about their production and prices. It not only prevents persons from using their capital, skill, and acts for the purpose of increasing prices; it reaches the very acme of absurdity, in preventing persons from uniting their capital, skill, and acts for the purpose of reducing prices. The legislature perhaps had in mind that which might possibly be a means of public oppression, to wit, the forced reduction of prices of articles which the combination or partnership purchased, but the act does not discriminate between articles purchased and articles sold. And it is because it does not so discriminate, because of the want of ordinary care in studying the meaning of words, that we have on the statute books of Texas at this close of the nineteenth century, during which combinations of capital and skill have cheapened the price of products to an extent unparalleled in the world's history, an act making it a highly penal offense for two or more persons to unite their capital and skill for the purpose of reducing the price of the products which they undertake to manufacture and sell.

The next question is, does this act of March 30, 1889, deprive any citizen or class of citizens of the equal protection of the law? The fourteenth amendment of the constitution, in declaring that no state shall deny to any person within its jurisdiction the equal protection of the law, imposes a limitation upon the exercise of all the powers of the state which can touch the individual or his property. Whatever the state may do, it cannot deprive any one within its jurisdiction of the equal protection of the laws, and by "equal protection of the laws" is meant equal security under them to every one, under similar terms, in his life, his liberty, his property, and in the pursuit of happiness. It not only implies the right of each to resort, on the same terms with others, to the courts of the country for the security of his person and property, the prevention and redress of wrongs, and the enforcement of contracts, but also his exemption from any greater burdens and charges than such as are equally imposed upon all others under like circumstances. This subject of equality before the law is a fundamental principle of English and American liberty, which not only has been held sacred in all latter-day constitutions, state and federal, but the principle has been guarded by the courts with jealous watchfulness, to see that the citizen may have guarantied to him this inestimable privilege and condition. Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. 357; Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064; Dent v. West Virginia, 129 U. S. 114, 9 Sup. Ct. 231; Ex parte Virginia, 100 U. S. 339; Duncan v. Missouri, 152 U. S. 382, 14 Sup. Ct. 570. The supreme court of the United States, in an unanimous opinion on the equality of the citizens, in Dent v. West Virginia, above, says:

"The great purpose of the requirement is to exclude everything arbitrary or capricious in legislation affecting the rights of the citizen."

The same court, speaking through Justice Matthews, in Yick Wo v. Hopkins, supra, says:

"When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not

mean to leave room for the play and action of purely personal and arbitrary power."

And the same court in Barbier v. Connolly put the same thought in the following language:

"These provisions are undoubtedly intended that there should be no arbitrary spoliation of property, but that equal protection and security should be given to all, under like circumstances, in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness and acquire and enjoy property; that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of any one, except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition; and that, in the administration of justice, no different or higher punishment should be imposed upon one than such as is prescribed to all for like offenses."

We do not mean to say by this that the state of Texas does not have the power to prescribe regulations to promote the health, peace. morals, education, and good order of its people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity. From the very necessities of society, legislation, sometimes of a special character, having these objects in view, must obtain in certain districts; and special burdens are sometimes necessary for general benefits, such as for supplying water, preventing fires, lighting districts, clearing streets, opening parks, and many other objects. As said by the courts, occasions for these purposes may press with more or less weight on one than upon another; but they are designed not to impose unequal or unnecessary restrictions upon any one, but to promote, with as little inconvenience as possible, the general good. Though, in many respects, necessarily special in their character, these, in proper limitations, do not furnish just grounds of complaint, if they operate alike upon all persons and property under the same circumstances and conditions. This statute under discussion is clearly class legislation, discriminating against some and favoring others. It is not that character of legislation which, in carrying out a public purpose, is limited in its application, and, within the sphere of its operation, affects alike all persons similarly situated. It may affect, and does affect, individuals of the same class in an opposite way. It favors some individuals of a certain class, and denounces other individuals of the same class. This statute exempts no class. On the contrary, it seeks to exempt certain classes of property, which is carrying the doctrine beyond any case to which we have had access. All property in the state is entitled to equal protection, and no special property is entitled to, or ought to receive, any special favors. Discrimination may be as potent against the citizen, in the direction of his property, as if aimed directly against himself personally. The right to hold or sell property, and to make agreements and contracts concerning it, which may be believed by the owner to be for his betterment, is the most essential right of

property. With some citizens, this right is taken away; with others, it is encouraged.

But it is contended upon the part of the state that the act is valid in restraint of trade on the ground of public policy; that combinations in restraint of trade are public acts. An additional reason against the law in this particular, is that, if that be true, all of the acts in restraint of trade are not public, but many of them are private; and, when we look closely to the object of the act, it will be seen that the business of the farmer, in growing vegetables, grain, cotton, wool, or meat, is no more a private occupation than that of the shoemaker, the blacksmith, or the bricklayer. If the anti-trust act of 1889, under discussion, applied only to those occupations where the business implies a trust or public duty, such as railways, telegraphs, telephones, etc., then the argument might be plausible that it is not class legislation, but such is not the case. The penalties are visited not only upon those exercising a public trust or duty, but upon the body of private citizenship, composed of artisans, mechanics, professional men, traders, and the like, giving advantage to certain persons that it refuses to others. Judge Simpkins, in the case of Railway Co. v. Wilson (Tex. App.) 19 S. W. 913, in discussing this question, said:

"In those occupations where the business implies a trust or public duty, the government has the power to see that the trust is not abused and the duty is properly performed. On this principle, statutes have been upheld that regulate the charges of railway companies, elevator, telephone, telegraph, and other companies, hackmen, warehousemen, mills, etc.; but we are aware of no well-considered case on which a statute has been upheld that undertook to regulate the dealings between employer and employé."

The exemption of agricultural products in the hands of the original producer and raiser exempts, upon a rough estimate, four-fifths of the people of Texas from the operation of this act, because four-fifths of the people of Texas are engaged in the business of producing and raising agricultural products and live stock. The penalties are visited upon the remaining one-fifth of the people, without regard to any particular class. This one-fifth comprises all classes and conditions not heretofore exempted. And this in the face of the constitutional guaranties, state and federal, of perfect equality of the citizen before the law. Even in the matter of labor the iniquitous character of the enactment under discussion is apparent. This statute makes no exemption of labor, or of the products of labor. Under its terms and provisions, the laborer is subjected to punishment for doing the very act that the landowner or farmer is authorized to do. The original producer, if a farmer, has authority to combine to fix prices, restrict trade, build up monopolies, while the original producers in other lines of labor are denounced for combining. The agricultural products of the farmer are the fruits of his labor, but no more so than the manufactured articles of the workingman are the fruits of his labor. The blacksmith, the carpenter, and all other artisans purchase their raw material, and the manufactured products constitute the fruits of their

labor, and upon which they must rely for the sustenance of themselves and families, just as the agricultural products of the farmer constitute the fruits of his labor, and upon which he relies for similar purposes; yet the statute prescribes total inequality between these classes, and encourages the one to build up monopolies, while denouncing the others if they make any attempt in the same direction; or, to apply the provisions of the statute to the matter of live stock, from which application this inequality becomes still more apparent, the cattle king may raise his thousands of head of live stock each year, and, so long as this stock remains in his hands, he can combine, not only with his neighbors, but with all other similar original producers throughout the state of Texas, or even throughout the United States, for the purpose of fixing the prices and monopolizing markets. Not so, however, with the hands which he employs, and which constitute the ordinary labor of the ranch. The fruits of the labor of the latter class are his day's work. This may be paid him either in money, which he invests in stock, or it may be paid him in stock, on shares, or otherwise; and yet. not being the original producer, he is forbidden to make any combination of any character whereby the price of the fruits of his labor can' be promoted or regulated in any manner whatsoever. These common laborers on the ranch can form no agreement among themselves whereby they can maintain the prices of their labor, and yet the ranch owner can combine with other ranch owners with reference to the prices of their products which constitute the fruits of their labor. The demonstration can be carried to a further absurdity by simply calling attention to the fact that under the terms of the statute the farmer or stock raiser may combine with any person, firm, or corporation whatsoever, or any number of them, in respect to agricultural products he has produced or the live stock he has raised, without fear of punishment under the law, and yet the party or parties with whom he makes such a combination may be held liable to all the penalties denounced against such combinations. Two citizens may combine, therefore, for the purpose of fixing prices; one, by doing so, committing a crime, and the other, by doing so, performing a laudable act. If this is equality before the law, within the meaning of the constitution, we had better revise the constitution. All of the decisions hold that where a distinction is necessary in classes of citizens, under the law, in every instance the classification must be reasonable. What ground can there be for setting aside, as this act has done, four-fifths of the citizens of Texas as an exempt class from the punishment for felony, because they are producing farmers? It is not because of their poverty, for they are not poor; and, if some of them are, they do not constitute all of the poor. It is not because of the character and location of their occupations. Neither can it be said to be on account of the lack of intelligence or ability to take care of themselves. It cannot be on account of the character of the products they produce, for one of the avowed purposes of the act was to prevent combinations and injury to the people of the state, and to protect them in

their acquirements of the commodities necessary for the enjoyment and sustenance of life; and yet the act puts it within the power of the men who produce nearly all of these articles to combine and raise the price and control it in any way they please. But it is argued that, on account of the large district of the country over which they are distributed, they cannot combine, and therefore it would have been useless to include them within the prohibition of the act. While there was no evidence before the court on this subject, we were asked to take judicial notice of the fact. We hardly find the allegation correct. The Swine Breeders' Association of the State of Texas, the proceedings of whose meetings are published in the public press of the country; the enormous wealth of the cattle raiser; the efforts, most energetic, of the cotton growers to limit the acreage by a combination with his fellows for the purpose of decreasing the quantity, and thus raise the price to the consumer,— are well known everywhere. But, if it should be true that the producing agriculturalists do not have the power to combine, what reason is that that they should be excluded from the penalty prescribed for combining? This is a strange proposition indeed; yet it is gravely argued in this tribunal by the representative of the state that the principal reason for granting to so large a body of citizens absolute immunity from punishment for felony for combining in restraint of trade is the fact that they are utterly unable to avail themselves of the great privilege thus granted. The court apprehends that this would not be accepted as a valid reason anywhere. Nor can it be successfully contended that the proposition is correct that the producing agriculturalist is unable to combine, nor that he has any privilege or rights on account of his location or occupation. We are familiar with the duties of the farmer and the cares and trials of his business life, and appreciate highly the customary compliments paid by mankind to the rural yeomanry of the land. He has been justly lauded for his integrity, and for the independence and importance of his calling. Without the products of his toil, people cannot live, nor society endure. Yet what is there about it all to entitle him to the privilege of combining in restraint of trade as to these articles he produces, while his neighbors, the storekeeper and mechanic, are precluded therefrom, and he himself is debarred from engaging with the same exemption from bartering in the products of his neighbor. If there is any one thing evident from a careful study of the act, it is that it is aimed to favor the agricultural class, and is against the merchant and mechanic, and all the others, without either reason or justice. I apprehend that it will not be questioned that the business of merchandising is not only legitimate, but laudable. Millions of people of this and other lands have made and are making their honest living, and millions more are being accommodated and served, thereby. Great empires, both ancient and modern, have built their strength and glory on their trade, and to-day we have great arteries of steel transportation pulsating across the continent, and white-winged fleets of commerce traverse the seas. They not only carry the

fruits of the labor of the agriculturalist, but what would he and the fruits of his labor be worth without them? The merchant, the manufacturer, the agriculturalist, three great classes of the world, each dependent upon the other, each entitled to the same protection before the law, each justly claims alike, under the constitution, the right of life, liberty, and property. They constitute one mighty peo‑ ple, citizens of one republic, all deserving of our care, all governed by the same laws, whose rights shall be weighed in the same balance, that shall not swerve a hair's breadth in favor of either while being held by the blind Goddess of Justice. Although the reasons alleged in support of the act by the state are inapplicable and invalid, and do not properly state the purpose for which the act was really passed, of course there was a purpose behind so important a piece of legisla‑ tion,—one that formulated the thing and procured its passage. Such a purpose is patent upon its face, and is apparent from the history of the act. It is a purpose thoroughly appreciated by the court and recognized by the public, but it is such a purpose that the con‑ stitution of the United States will not support, nor the courts thereof favor. The court can find no better language in this connection— almost prophetic in some respects—than that used by Judge Catron, of Tennessee, in two early cases, viz. Wally v. Kennedy, 2 Yerg. 555, and Vanzant v. Waddel, Id. 270:

"The rights of every individual must stand or fall by the same rule of law that governs every other member of the body politic, or land, under similar cir‑ cumstances; and every partial or private law which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies lead‑ ing to similar consequences, is unconstitutional and void. Were it otherwise, odious individuals or corporate bodies would be governed by one law; the most of the community, and those who made the law, by another; whereas a like and general law, affecting the whole community equally, could not have been passed." "The idea of people, through their representatives, making laws whereby are swept away the life, liberty, and property of one or a few citizens, by which neither the representatives nor their other constituents are willing to be bound, is too odious to be tolerated in any government where freedom has a name. Such abuses resulted in the adoption of the Magna Charta in England, which is, and for centuries has been, the foundation of English liberty. Its infraction was a leading cause why we separated from that country, and its value as a fundamental rule for the protection of the citizen against legislative usurpation was the reason of its adoption as a part of our constitution."

This law that deprives the citizen of many of his rights of contract, and that seeks to divide citizens, not exactly by the calling they fol‑ low, but by the source of the property they hold, and exempts 80 per cent. of them from the penalties it visits upon the remainder, is not sustained by any good reason or excuse; is not just; is utterly with‑ out support in law, and can have no just purpose; is vicious class legislation, depriving the citizen of his constitutional right of life, liberty, and property without due process of law, contrary to the law of the land; and is therefore declared to be null and void. The relator is discharged.