The State v. Smiley.

---

THE STATE OF KANSAS v. E. J. SMILEY.

No. 12,887.    (69 Pac. 199.)

SYLLABUS BY THE COURT.

1. STATUTES—*Construction—Presumption of Intention of Legislature.* The general language of statutes will be limited to such persons and subjects as it is reasonable to presume the legislature intended it should apply.

2. ———— *Constitutional Validity—Persons Capable of Making Objection.* Objections to the constitutional validity of statutes can be made only by those to whom the enactment applies and against whom attempts to enforce it are made.

3. PUBLIC POLICY—*Anti-competitive Trade Agreements—Valid Statute.* The making of anti-competitive trade agreements, as to products and merchandise bought or sold on the general market, is contrary to public policy, and it is competent for the legislature to enact penal measures to prevent the making and carrying out of such agreements.

4. ———— *Anti-trust Law Valid—No Conflict with Federal Constitution.* Chapter 265, Laws of 1897 (Gen. Stat. 1901, §§ 7864–7874), known as the "anti-trust law," does not conflict with the guaranty of right to acquire property by lawful contract secured by the federal constitution, and is a valid exercise of legislative power.

5. ———— *Agreement in Restraint of Trade.* An agreement entered into by all the dealers on a certain market, limiting their right, severally, under stipulated forfeitures or penalties, to buy

all the grain they otherwise might on such market, is an agreement in restraint of trade, and falls within the penal terms of the anti-trust act of 1897.

6. INSTRUCTIONS—*Harmless Error.* An instruction to the jury, possibly erroneous, but, if so, harmless, discussed, and the lack of error in giving it pointed out.

Appeal from Rush district court; J. E. ANDREWS, judge. Opinion filed June 7, 1902. *In banc.* Affirmed.

*A. A. Godard,* attorney-general, *J. W. McCormick,* county attorney, *Keeler & Hite,* and *Allen & Allen,* for The State.

*H. Whiteside,* for appellant.

The opinion of the court was delivered by

DOSTER, C. J.: This is an appeal from a judgment of conviction of a violation of the anti-trust law. The information on which the conviction was based reads as follows:

"I, the undersigned county attorney of said county, in the name and by authority and on behalf of the state of Kansas, give information that on the 20th day of November, A. D. 1900, in said county of Rush and state of Kansas, one E. J. Smiley, secretary and representative of the Kansas State Grain Dealers' Association, did then and there unlawfully enter into an agreement, contract, and combination, in the county of Rush and the state of Kansas, with divers and sundry persons, partners, companies, and corporations, or grain dealers and grain buyers, in the town of Bison, in said county and state aforesaid, to wit: Humburg & Ahrens, the La Crosse Lumber and Grain Company, the Bison Milling Company, and George E. Weicken, who were at the same time and place competitive grain dealers and buyers, to pool and fix the price the said grain dealers and buyers should pay at the said place and to divide between them the net earn-

16—65 KAN.

ings of said grain dealers and buyers, and to prevent competition in the purchase and sale of grain among the said dealers and buyers, contrary to the form of statute in such case made and provided and against the peace and dignity of the state."

The proceeding was instituted and conviction had under chapter 265, Laws of 1897 (Gen. Stat. 1901, §§ 7864–7874). A question is raised as to whether the charge was made and judgment pronounced under that or certain other statutes. This will be noticed hereafter. The parts of the act of 1897 which apply to the case read as follows:

"SECTION 1. A trust is a combination of capital, skill, or acts, by two or more persons, firms, corporations, or associations of persons, or either two or more of them, for either, any or all of the following purposes:

"*First.* To create or carry out restrictions in trade or commerce, or aids to commerce, or to carry out restrictions in the full and free pursuit of any business authorized or permitted by the laws of this state.

"*Second.* To increase or reduce the price of merchandise, produce, or commodities, or to control the cost or rates of insurance.

"*Third.* To prevent competition in the manufacture, making, transportation, sale or purchase of merchandise, produce, or commodities, or to prevent competition in aids to commerce.

"*Fourth.* To fix any standard or figure, whereby its price to the public shall be, in any manner, controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, use or consumption in this state.

"*Fifth.* To make or enter into, or execute or carry out, any contract, obligation or agreement of any kind or description by which they shall bind or have to bind themselves not to sell, manufacture, dispose of or transport any article or commodity, or article of trade, use, merchandise, commerce, or consumption, below a common standard figure; or by which they shall agree in any manner to keep the price of such

article, commodity or transportation at a fixed or graded figure; or by which they shall in any manner establish or settle the price of any article or commodity or transportation between them or themselves and others, to preclude a free and unrestricted competition among themselves or others in transportation, sale or manufacture of any such article or commodity; or by which they shall agree to pool, combine or unite any interest they may have in connection with the manufacture, sale or transportation of any such article or commodity, that its price may in any manner be affected.    And any such combinations are hereby declared to be against public policy, unlawful, and void.

"Sec. 2. All persons, companies or corporations within this state are hereby denied the right to form or to be in any manner interested, either directly or indirectly, as principal, agent, representative, consignee, or otherwise, in any trust as defined in section 1 of this act."

Subsequent sections of the act contain penal provisions under which appellant was fined and ordered committed to jail.    The above statute is assailed with great vehemence by counsel for appellant.    Their contention is that it imposes such limitations upon freedom of contract as to constitute a deprivation of the right of property, contrary to the guaranty of the fourteenth amendment to the federal constitution. They say that, instead of being what it purports, an act to prevent unreasonable restrictions upon trade, it is itself such restriction, and is therefore violative of the fundamental right to acquire property by lawful contract.    To enforce these contentions, many generalities of language, culled out of the reported decisions and the writings of the commentators, have been quoted, but no concrete instances of holdings by courts of last resort adverse to enactments of the character of the one in question have been cited. Two recent decisions by subordinate federal judges

ruling against the validity of statutes of a similar kind have been called to our attention. (*In re Grice*, 79 Fed. 627; *Niagara Fire Ins. Co. v. Cornell*, 110 id. 816.) The opinions in both these cases, so far as they discuss the subject of the repugnancy of the acts under consideration to the constitutional guaranty of freedom of contract, are open to the criticism of being without the bounds of the meritorious question at issue. This is perceivable at once. The first-mentioned case involved the "anti-trust" statute of Texas. That statute exempted from its terms the original producer or raiser of agricultural products or live stock. The other case involved the "anti-trust" statute of Nebraska. That statute exempted from its provisions assemblies or associations of laboring men. The making of these exceptions was class legislation, and constituted a denial of the equal protection of the law — so the judges ruled. That ruling was all-sufficient for the purpose of the cases. Not only that, it was on the only necessary question in the cases. Hence, the disposition made of them on the one special feature forbade an opinion on the abstract general question, and rendered all that was said upon it *dictum* of the baldest kind. The supreme court of the United States recently had a like occasion to declare the law in advance of the presentation of a necessary issue concerning it. It was in the case of *Connolly et al. v. The Union Sewer Pipe Co.*, just decided. (22 Sup. Ct. 431.) That case involved the validity of the "anti-trust" law of Illinois, an enactment similar to the statutes of Texas and Nebraska, and like them containing an exception in favor of a certain class. The court held the statute invalid because of the exception, but very properly refrained from making pro-

nouncement of. what the law would be if it had not contained the exception.

The opinions of the judges in the cases of *In re Grice*, supra, and *Niagara Fire Ins. Co. v. Cornell*, supra, are not regarded by us as authority.   They are, however, adopted as arguments by counsel for appellant, and as such are entitled to consideration.   Nevertheless, as arguments, they are barren of reference to adjudged cases, except in the form of quotations of abstract and general statement.   The burden of their reasoning is that the statutes under consideration were so broad and comprehensive in their terms as to be inclusive of classes of persons and kinds of business that it would be unreasonable and tyrannical to regulate in the mode attempted.   In the case first cited it was said, among other things of like kind :

"Two village grocers doing business at a loss to both could not form a partnership in order to save themselves from bankruptcy.   Neither could they form a partnership in order to lessen their expenses, and thus reduce the price of their commodities to the public.   Still more, if A. and B., each owning half a car-load of potatoes, should agree to ship together, in order to obtain car-load rates, thus enabling them to sell lower in the markets, they would violate this act."

In the other case the assumed unreasonableness and tyranny of the statute is illustrated by the following, among others, as typical instances :

"If this law is valid, two or more farmers cannot agree that they will not sell their wheat to a neighboring mill for less than so much per bushel.   Two or more farmers cannot agree that the live-stock feeder shall not have their corn except at a certain price. Nothing can be agreed to by the manufacturer, the farmer, the gardener, the contractor, consumer or laborer to prevent the reduction of price."

If the statutes of Texas and Nebraska were really

to be enforced against the classes of persons mentioned, and to the utter length stated by the judges in the two cases cited, they well deserved the condemnation they received; and if our statute is to be held to apply in the like way we should not hesitate to declare it to be violative of the most fundamental principles of constitutional right—that is, we should not hesitate to do so when the question of its invalidity should be presented by some one entitled to complain, to wit, one of the proscribed and oppressed classes; nor shall we hesitate to do so in behalf of appellant in this case, if, upon examination, we find him to belong to one of such classes. However, it was not charged against him, or claimed by him, that he belonged in any such category. It was neither charged nor claimed that his confederacy with the other persons named in the information was for purposes of a business partnership, or that he was one of two shippers of produce seeking to lighten freight charges by joining with the other, or that he was a farmer agreeing with his neighbors to hold his grain for an advance in the market; nor was it charged or claimed that the acts performed by him were, as to the examples enumerated, of a like limited scope and a like presumptively harmless and reasonable nature. It was charged and proved against him that he was a buyer of grain on the general open market; that he was an intermediary between the public who produced and sold and the public who bought and consumed, and as such that he conspired with others of like business to prevent competition among themselves, and to pool and fix the price of grain bought and sold on such market.

Now, whether this fact takes him out of the list of those innocent instances cited in the cases we are dis-

cussing we will presently inquire. Suffice it to say for the moment that unless he does belong in such list he cannot be heard to complain. He cannot be heard to object to the statute merely because it operates oppressively upon others. The hurt must be to himself. The case, under appellant's contention as to this point, is not a case of favoritism in the law. It is not a case of exclusion of classes who ought to have been included, the leaving out of which constitutes a denial of the equal protection of the law, but it is the opposite of that. It is a case of the inclusion of those who ought to have been excluded. Hence, unless appellant can show that he himself has been wrongly included in the terms of the law, he can have no just ground of complaint. This is fundamental and decisively settled. (*City of Kansas City v. Railway Co.*, 59 Kan. 427, 53 Pac. 468, 52 L. R. A. 321, affirmed under the title *Clark v. Kansas City*, 176 U. S. 114, 20 Sup. Ct. 284, 44 L. Ed. 392; *Supervisors v. Stanley*, 105 U. S. 305, 311, 26 L. Ed. 1044; *Pittsburg &c. R. Co. v. Montgomery*, 152 Ind. 1, 49 N. E. 582, 71 Am. St. Rep. 302, 311.)

In immediate connection with the subject just discussed, the question arises whether, assuming the general phraseology of the statute to be comprehensive of classes of persons who cannot be rightfully included therein, the whole enactment becomes nullified thereby. The general doctrine is that only the invalid parts of a statute are without legal efficacy. This is qualified by the further rule that if the void and valid parts of the statute are so connected with each other in the general scheme of the act that they cannot be separated without violence to the evident intent of the legislature, the whole must fall. These rules are of every-day enforcement in the courts. The

latest case in which they were adverted to by us is *Hardy v. Kingman County*, ante, p. 111, 68 Pac. 1078. The instances in which the application of the rule first mentioned most usually occurs are those where separable words, clauses, sentences or sections of the statute are stricken out, as it were, because constitutionally objectionable.   However, the rule is not limited to such instances.   It applies as well to exclude from the operation of the statute subjects and classes of things lying without the legislative intent, although comprehended within the general terms of the act, as it does to exclude parts of the verbal phraseology.

Two cases strikingly illustrative of this rule are *Supervisors v. Stanley*, 105 U. S. 305, 26 L. Ed. 1044, and *Commonwealth v. Gagne*, 153 Mass. 205, 26 N. E. 449, 10 L. R. A. 442.   See, also, to the same effect *McKee v. United States*, 164 U. S. 287, 293, 17 Sup. Ct. 92, 41 L. Ed. 437 ; *Packet Co. v. Keokuk*, 95 U. S. 80, 24 L. Ed. 377.   In the first-mentioned case it was held that a state taxing statute, general in its terms, applying alike to all taxpayers, which did not recognize a certain exception allowed by act of congress in favor of stockholders in national banks, was not for that reason void as a whole, but, limited by the controlling federal law, was valid as to all the persons embraced within the general language employed.   In the other case it was held that a state prohibitory liquor law which did not except from its operation liquors in original packages, but by the generality of its terms included them, which under the commerce clause of the federal constitution, as construed in *Leisy v. Hardin*, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed., 128, could not be done, was not for that reason void as to liquors in broken packages, but as to them was valid and enforceable.   This ruling, in nec-

essary effect, was approved by the supreme court of the United States in the case of *In re Rahrer*, 140 U. S. 545, 11 Sup. Ct. 865, 35 L. Ed. 572. In that case Rahrer contended that after the decision of *Leisy v. Hardin*, supra, there was no law in Kansas prohibiting the sale of liquor in original packages; that the effect of the subsequent act of congress, popularly called the ''Wilson bill,'' being an act to subject interstate importations of liquor in original packages to the operation of the local law, could not have the effect to give vitality to that which as a statute had existence in form only, and not in fact, but that a new state enactment was required. The soundness of this contention was denied, and in denying it the court, after restating the ground of the decision in *Leisy v. Hardin*, said :

''This was far from holding that the statutes in question were absolutely void, in whole or in part, as if they had never been enacted. On the contrary, the decision did not annul the law, but limited its operation to property strictly within the jurisdiction of the state.''

When the court did that, it only did what courts are in the daily habit of doing—limited the language of the statute to the subjects in respect of which it was competent and proper for the legislature to dispense. Throughout the entire history of English and American law the courts have been ruling that the general words of statutes were to be restrained in import and application whenever the taking of them in literal sense would lead to absurd or hurtful consequences, and the same is true under the American system of written constitutions, whenever the taking of general words in their full signification would expose them to conflict with the organic law. It is but an affectation

of sensitiveness of regard for the constitution which often leads courts to beat down the whole of a legislative enactment because of its opposition to the fundamental ordinance in some minor particular, instead of adjusting it to harmonize with the controlling provision. It is not a matter of concern to us that the general language of the statute under consideration may apply to classes of persons who should not have been comprehended therein, and who may have a standing in court to claim exception therefrom. Their cases can be attended to when presented in due form. It is not they but the appellant who is before us. Does he state a case entitling him to exemption from the operative scope of the statute? One of the cases most strikingly illustrative of the rule of interpretation in question is *In re Opinion of the Justices*, 41 N. H. 553. It was claimed that certain sections of the statutes of New Hampshire were so broad and general as to be in opposition to what was called the "fugitive-slave law" of congress, and the constitutional provision in pursuance of which it was enacted. Replying to this claim, the justices said:

"But if these sections could not be applied in the cases supposed, they are not, therefore, necessarily void. If the intention of any part of the act, determined upon settled principles of legal interpretation, were to obstruct or impede the exercise or enjoyment of any right secured by the constitution of the United States, or by any constitutional law of the United States, that part would be unconstitutional. But if the intention thus determined were merely to establish, regulate, or guarantee rights or privileges consistent with the constitution and laws of the United States, in a mode not in conflict with either, and if the act would constitutionally apply to a large class of cases that do and will exist, it would not be rendered unconstitutional by the fact that, literally construed, its

language might be broad enough to extend to a few exceptional cases where it ,could not constitutionally apply ; since, upon settled principles of construction, the latter are as fully and effectually excepted by necessary implication, as if the statute had contained an express proviso that it should not extend or apply to such cases. The rule of construction universally adopted is, that when a statute may constitutionally operate upon certain persons, or in certain cases, and was not evidently intended to conflict with the constitution, it is not to be held unconstitutional merely because there may be persons to whom or cases in which it cannot constitutionally apply ; but it is to be deemed constitutional, and to be construed not to apply to the latter persons or cases, on the ground that courts are bound to presume that the legislature did not intend to violate the constitution.''

There are some decisions of the supreme court of the United States said to be in opposition to the above-stated theory of construction of statutes. In our judgment they are not, although the language of some of the opinions confuses the subject. They were cases in which the court, while admitting the existence of the rule, held it inapplicable to the particular statutes under consideration. The principal ones are : *United States v. Reese et al.*, 92 U. S. 214, 23 L. Ed. 563 ; *Trade-mark Cases*, 100 id. 82, 25 L. Ed. 550 ; *United States v. Harris*, 106 id. 629, 1 Sup. Ct. 601, 27 L. Ed. 290 ; and *Baldwin v. Franks*, 120 id. 678, 7 Sup. Ct. 656. All of these cases raised questions as to the validity of legislation enacted under the special and limited powers of congress. The one first cited involved certain of the provisions of what is known as the ''enforcement act'' of May 31, 1870, which act sought to give effect to the fifteenth amendment of the constitution, prohibiting discriminations in the matter of suffrage between citizens on account of race, color,

etc. The act, however, was directed in general terms against discriminations for any and all reasons, not for the particular reason of race or color.

Inasmuch as the sole power conferred on congress by the fifteenth amendment was one to effectuate by appropriate legislation the prohibition against discriminations between citizens on account of the specific characteristics named, it was held that an act which undertook to prohibit discriminations generally could not be narrowed by construction into a prohibition of discriminations practiced because of race or color. In the *Trade-mark Cases* the statute under consideration was one which made punishable those who sold or had in their possession counterfeits or colorable imitations of the trade-marks of other persons. Inasmuch as trade-marks are not the subjects of congressional legislation, except as they may be used on articles of interstate commerce, or commerce with foreign nations and the Indian tribes, it was decided that a statute relating to their use on articles of commerce generally could not be upheld as applicable to the one specific subject in respect to which congress might legislate, there being no hint or intimation in the act of a purpose to have it so confined. The cases of *United States v. Harris* and *Baldwin v. Franks* involved the question of the validity of section 5519, Revised Statutes of the United States. That section in general terms sought to make punishable those who conspired to deprive other persons of the equal protection of the laws, or of equal privileges and immunities under the laws. Inasmuch as congress can interfere to secure equality of legal protection and equality of privileges and immunities only as specifically authorized, as, for instance, under the fifteenth amendment, to prevent discriminations in

suffrage on account of race, color, etc., or in execution of the treaty power to prevent the deprivation of treaty rights accorded to citizens or subjects of foreign nations, it was held that the section of the statute cited was too general in its terms to be narrowed by construction into one in execution of any of the specific powers.

The decisions we have thus distinguished from the one we make are philosophic and reasonable. They are bottomed upon the fact of the special and limited powers of congress, and this fact, though not commented on at length as the basis of the judgments rendered, is nevertheless adverted to in all of them, and obviously constitutes the *ratio decidendi* of the cases. It was plainly expressed by Mr. Justice Woods in *United States v. Harris,* who said in one part of the opinion : " It must, nevertheless, be stated that the government of the United States is one of delegated, limited and enumerated powers," and who then in another part tersely remarked : " Those provisions of the law, which are broader than is warranted by the article of the constitution by which they are supposed to be authorized, cannot be sustained." If we might be allowed to undertake the statement of a rule of interpretation applicable to the class of federal statutes considered in the above-cited cases, it would be that a power which is specifically limited cannot be allowed to express itself in general terms, and a limitation of the general language to the specific power will not be implied. On the other hand, however, a power which is unlimited, except as specifically prohibited, may express itself in general terms, and the specific instances of limitation will be implied as provisos. This furnishes a rational basis of discrimination between rules of interpretation applicable in the respect under con-

sideration to federal and state legislation. Congress cannot legislate on all subjects, as can a state legislature. Therefore its enactments must show on their face their application to that to which as matter of constitutional limitation they should be confined. For example, a state legislature is empowered to legislate generally in respect to all trusts and conspiracies in restraint of trade, except as limited by the commerce clause of the federal constitution; but, on the other hand, congress is not empowered to legislate generally with respect to trusts and trade conspiracies. It can legislate against them only under the commerce clause of the constitution. Therefore, a state enactment, though broad enough in terms to apply to trusts engaged in interstate commerce, or conspiracies in restraint of interstate trade, will be limited by construction to that to which it can alone legally apply; but a congressional act, being of necessity limited to the one particular class of trusts or trade conspiracies, viz., those engaged in interstate or international trade, must express that limitation on its face. Nevertheless, we do not doubt that if a congressional enactment, general in terms, could be given specific application to subjects lying within its rightful sphere, without the aid of other and qualifying or explanatory words, but which general terms were also inclusive of subjects lying without such sphere, it would be restrained by construction to those matters in respect of which congress is qualified to dispense, and not be nullified as a whole.

In considering the possible view of the supreme court of the United States of the rule of interpretation of the general language of statutes, it is important to observe that that court does not apply the rule of the *Trade-mark* and other like cases to state legis-

. lation supposed to be in conflict with the federal constitution or laws, but, on the contrary, applies the one we invoke in this case. It did so in *Supervisors v. Stanley*, supra, *Packet Co. v. Keokuk*, supra, and *In re Rahrer*, supra, and lately did so in *Waters-Pierce Oil Company v. Texas*, 177 U. S. 28, 42, 20 Sup. Ct. 518, 44 L. Ed. 657. In that case the contention was made that a statute of Texas was so broad in its terms as to prohibit foreign corporations from engaging in interstate, as well as domestic, commerce, and hence was unconstitutional. This claim and the disposition made of it were stated as follows :

"The claim is, if we understand it, that the statute prohibits all business of foreign corporations, and hence is unconstitutional, as including interstate business, and cannot be limited by judicial construction to local business, and the unconstitutional taint thereby removed. To sustain the contention, *United States v. Reese*, 92 U. S. 214, 221, 23 L. Ed. 563; *Trade-mark Cases*, 100 U. S. 82, 25 L. Ed. 550; *United States v. Harris*, 106 U. S. 629, 1 Sup. Ct. 601, 27 L. Ed. 290; *Baldwin v. Franks*, 120 U. S. 678, 7 Sup. Ct. 656, 763, 32 L. Ed. 766, and some other cases are cited. They do not sustain the contention. The interpretation of certain statutes of the United States was involved, and the court, finding the meaning of the statutes plain, decided that it could not be changed by construction, even to save the statutes from unconstitutionality."

It may be said that the judgment from which the above quotation is made, so far as concerned the point noticed, was rested upon the rule that the federal courts will adopt the construction which the state tribunals place on their own statutes. Be it so, if that is a sufficient reason. We construe the general words of our statute to be comprehensive only of those cases which are the rightful subjects of legislation of

the kind in question. However, we disavow doing so merely in order to shelter the statute under the rule mentioned, but because the ancient, established and wise canon of interpretation requires it to be done. Sporadic and anomalous cases indicating to the contrary may be found, as they may be found to the contrary of every settled, accepted doctrine of the law, but the rule that the general words of statutes will be restricted in application to cases presumptively within the legislative intent has been so long accepted as a cardinal principle that its occasional denial, even by the most learned of courts, fails utterly of adverse impression.

"It happens in two sorts of cases, that it is necessary to interpret the laws. One is when we find in a law some obscurity, ambiguity, or other defect of expression; for in this case it is necessary to interpret the law in order to discover its true meaning. And this kind of interpretation is limited to the expression, that it may be known what the law says. The other is, when it happens that the sense of a law, however clear it may appear in the words, would lead us to false consequences, and to decisions that would be unjust if the laws were indifferently applied to everything that is contained within the expression. For in this case the palpable injustice that would follow from this apparent sense, obliges us to discover by some kind of interpretation, not what the law *says,* but what it *means;* and to judge by its meaning, how far it ought to be extended, and what are the bounds that ought to be set to its sense." (Dwarris, Stat. 138. [Domat's Rules.] )

It must not be understood from anything we have said that we assume that any of the cases instanced by the judges in *In re Grice* and *Niagara Fire Ins. Co. v. Cornell, supra,* were really within the legislative thought when our statute of 1897 was enacted, and

therefore that the general words of the act must be restrained to less than the intent they outwardly manifest.  Such legislation must be viewed in the light of the fact that the industrial and commercial classes of the country are menaced, or are supposed to be menaced, as never before, by gigantic combinations of capitalistic interests, having for their object the suppression of competition, the control of prices and the monopolization of markets; that this fact more than any other topic constitutes the theme of public discussion and the occasion of public alarm; that legislators in both state and national assemblies are earnestly besought by their constituents to devise measures to avert what, either rightly or unduly, is conjectured to portend a direful subversion of our entire economic system, and that the enactments of the kind in question are the responses of the lawmaking bodies to the demands of the immediate time.  These are the facts of the current period, known and read of all men, and discovering to the courts as well as to everybody else the intent of the legislature.  How vain, then, to affect to find the small personal affairs of obscure and irresponsible individuals, totally lacking all the elements of public concern, embraced within the legislative cognizance and made the subjects of hostile legislative fiat.

From very early times it was the policy of the common law to encourage competitive trade, and to discourage contract restraints upon it.  The courts refused to enforce stipulations between parties looking to the imposition of such restraints.  That rule of policy remains to this day, and to this day the courts continue their refusal to countenance contracts of the character mentioned.  To this there has been and is but one exception or class of exceptions, and it is more

17—65 KAN.

seeming than real.    It is the case of the sale of a mer-
chandise, mechanical or other like business, or the
sale of property for a specific use, or the contract of
an apprentice, agent, clerk, or servant.    In these and
kindred cases it has been held lawful to insert a stipu-
lation that the seller shall not engage in competitive
business with the buyer of his property ; or that the
apprentice, agent, clerk, or servant, after learning the
master's or employer's business, shall not set up in
opposition to him.    The reason for these exceptions is
that in such cases the buyer bargains for more than
physical property.    He bargains for the good-will of
his vendor's business, or other like valuable advantage,
and the master or employer parts with something
more than the wages he pays.    He parts with instruc-
tion in the business learned—parts not only with the
secrets of the general trade or calling, but with the
secrets of his own particular business, and parts with
the favorable acquaintance of his own customers or
clients.    The fact that these and the like constitute
the only exceptions to the general rule, and the
grounds upon which the exceptions rest, are elabor-
ately set forth in the opinion of Judge Taft in the case
of *United States v. Addyston Pipe & Steel Co.* 54 U. S.
App. 705, 29 C. C. A. 141, 85 Fed. 271.    In that case
the validity of legislation of the character now in
question was upheld in an opinion of great strength
and cogency, and with citations to a great list of sup-
porting authorities.    The case was appealed to the
supreme court, which affirmed the decree rendered so
far as it sought to enforce the provisions of the act of
congress of July 2, 1890, known as the " Sherman
anti-trust act," modifying it only to the extent of
excluding from its terms the operations of the appel-
lant company in matters of domestic commerce over

which the federal law could not be extended. (*Addyston Pipe & Steel Co. v. United States*, 175 U. S. 211, 248, 20 Sup. Ct. 96, 44 L. Ed. 136.)

A great array of decisions, English and American, will be found cited in the first-mentioned case, all tending to the establishment of the proposition that combinations having for their object the restraint of trade by the prevention of competition are inimical to public policy, their contracts in furtherance of their object non-enforceable, and their agreements of confederacy, followed by acts in prosecution of their purpose, rightful subjects of restrictive and penal legislation. Two of these decisions were made in *United States v. Freight Association*, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, and *United States v. Joint Traffic Association*, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259. In those cases it was held that agreements between competing railroad companies to fix and maintain non-competitive traffic rates were in violation of the "anti-trust act" of congress, and were subject to be annulled, and the associations formed thereby dissolved at the suit of the government. Counsel for appellant denies the applicability of these cases and that of the *Addyston Pipe & Steel Company*, supra, on the grounds : First, that the statute which the decisions enforced was enacted under the authority of congress to regulate commerce between the states ; second, that such statute is not directed against agreements or combinations restrictive of competitive trade, but has for its object the suppression of monopolies. The first of these distinctions is founded on the dictum of the judge in *Niagara Fire Ins. Co. v. Cornell*, supra. He said :

"The *Railroad Traffic Association Case*, 166 U. S. 290, 17 Supt. Ct. 540, 41 L. Ed. 1007, has been

strongly urged by the attorney-general as upholding the doctrine of this statute. But it does not, for the reason that the statute under consideration in that case was upheld by reason of the commerce clause of the constitution; and to that extent the commerce clause controlled the other clauses of the constitution; and I repeat, that the statute with which I am dealing is a state statute.''

There is one plainly expressed and one possible thought in this excerpt: First (the possible one), the authority can be exercised in pursuance only of express constitutional grant. That is not true of a state enactment, because the legislature of a state possesses all power not expressly withheld. It is true of a congressional enactment, because congress possesses only such power as is expressly conferred. The express grant of power to congress conferred by the commerce clause of the constitution only put that body on the footing as to interstate commerce that the local legislature has as to domestic commerce without an express grant and in virtue of its general authority. The grant to congress was not of anything different in nature from what the states possessed. It was a grant of the same thing—no more, only to be exercised in a different sphere. As to the other thought—the one plainly expressed by the judge in the above quotation, to wit, that the commerce clause of the constitution controlled the other clauses of that instrument—we trust we will not be taken to mean disrespect or to impugn motives when we say it is a thought which can be entertained only by one fatally bent on finding pretexts to justify his own mischievous rulings. The plain import of the language used is that the commerce clause is stronger than the other clauses— stronger than the guaranties of liberty, property, and process of law, contained in the fourteenth amend-

ment.   In other words, the claim is that the com-
merce clause gives congress the authority to override
and set at naught the guaranties of popular right con-
tained in the constitution whenever and wherever nec-
essary to effectuate the power to regulate interstate and
international trade.   This is the very madness of un-
reason.   The proposition needs but to be stated in the
ultimate terms to which we have reduced it, and they
are the terms to which of necessity it must be finally
reduced, to show its utter unsoundness.

The second distinction which counsel for appellant
seek to draw between the federal cases cited and this
case, to wit, the difference between legislation re-
strictive of non-competitive agreements and restrict-
ive of monopolies, has no more basis upon which to
rest than has the first one.   The power to regulate is
the same in both cases and may be exercised to the
same extent.   However, the statute enforced in the
*Freight Association Cases* and the *Addyston Pipe &
Steel Company* case was a statute in prohibition of
contracts restrictive of competitive trade as well as in
prohibition of monopolies.   That statute differs in
verbal phraseology, but not in essential particular or
effect from ours.   It reads:

"SECTION 1.  Every contract, combination in the
form of trust or otherwise, or conspiracy, in restraint of
trade or commerce among the several states, or with
foreign nations, is hereby declared to be illegal," etc.

"SEC. 2.  Every person who shall monopolize, or
attempt to monopolize, or combine or conspire with
any other person or persons to monopolize, any part
of the trade or commerce among the several states or
with foreign nations, shall be deemed guilty of a mis-
demeanor," etc.

The federal court decisions cited were more par-
ticularly in assertion of the authority of congress to

enact measures in suppression of anti-competitive trade combinations than they were in assertion of its right to prohibit trade monopolies. In the case of *United States v. Joint Traffic Association*, one of the head-notes reads :

"Congress, with regard to interstate commerce, and in the course of regulating it, in the case of railroad corporations, has the power to say that no contract or combination shall be legal which shall restrain trade and commerce by shutting out the operation of the general law of competition."

If counsel mean to say that agreements restrictive of trade competition may not be prohibited until they eventuate in monopolies, we reply, without pausing to reason the contrary of the proposition, that the *rationale* of all the cases, and particularly those of the federal courts commented on above, is opposed to the claim, and in *United States v. Addyston Pipe & Steel Co.*, supra, it was expressly ruled that, "in order to vitiate a contract or combination, it is not essential that its result should be a complete monopoly ; it is sufficient if it really tends to that end and to deprive the public of the advantages which flow from free competition." That ruling was on a substantiative issue involved in the case, and as made is a quotation from the opinion *arguendo* of Chief Justice Fuller in *United States v. E. C. Knight Company*, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325. If counsel mean to say that acts prohibitive of anti-competitive combinations must express on their face a limitation to combinations constituting or tending to monopoly, a sufficient reply is that the anti-trust act of congress, above partially quoted, and which has been repeatedly upheld as a valid exercise of legislative authority, does not express any such limitation. Whether an agreement restrictive

of trade combinations tends to monopoly is probably a question determinable by the courts as well as by the legislature, but, primarily at least, it is a question in economic science addressed to the business judgment and experience of the members of the law-making body. However, if the legislature should condemn a particular engagement between men on the score of its tendency to monopoly which the general sense of mankind perceived could not have that effect, we doubt not the courts would be competent so to declare, and, so declaring, disapprove the act on the constitutional ground of its interference with the freedom of the citizen ; but beyond such instances we apprehend the judicial tribunals are not authorized to go. The courts may determine without previous legislative declaration that a particular agreement is contrary to public policy, and therefore non-enforceable ; but they cannot adjudge, in opposition to a legislative declaration that a general class of agreements is opposed to the rules of public policy, that such is not the case.

One other topic included in the general subject remains to be discussed. It will be done briefly. It will be observed by an examination of the cases, both those on the subject of anti-competitive trade agreements, and those on the subject of monopolies, that most of them relate to the acts or agreements of vendors — sellers on the market — and not to the acts or agreements of vendees — buyers on the market. This has not been because different principles of law apply to the two classes of persons in their trade relations and dealings, but because the oldest and favorite form of forestalling and engrossing markets has been to monopolize the supply of trade products and hold them for extortionate prices. The rules of pub-

lic policy forbid the making of agreements not to buy on the market as well as agreements not to sell. This is well illustrated by two cases. In *Craft v. McConoughy*, 79 Ill. 346, 22 Am. Rep. 171, it appeared that the grain dealers of a town had made a compact not to compete with one another in the purchase of grain, but collectively to control the market at fixed prices. One of them sued in execution of the agreement, but the court denied relief, on the ground that it was a contract in restraint of trade and contrary to public policy. In *Chapin v. Brown*, 83 Iowa, 156, 48 N. W. 1074, it appeared that the grocerymen of a town, in order to throw the trade in butter entirely into the hands of one of their number, entered into an agreement with one another not to buy butter or take it in exchange for other goods. Suit was brought on the agreement against one of the grocerymen to enjoin him from dealing in butter. The court refused the injunction, because the contract entered into was restrictive of trade competition and tended to monopoly, and was therefore opposed to public policy. See, also, *Hilton v. Eckersley*, 6 Ell. & Bl. 47.

Now, the agreement entered into by appellant and others named in the information in this case did not differ in any essential particular from the agreements condemned in the cases above cited. In this case it was shown that the parties named embraced all of the grain buyers at the town of Bison; that they agreed among themselves to divide the grain trade at that place; that, although the agreement was that any one was at liberty to buy as much grain as he chose and to pay for it such price as he chose, nevertheless, if he purchased more than his allotted share he should pay to the others three cents per bushel for the excess bought; that this agreement was entered into for

the express purpose of preventing competition among the buyers, and that it had that effcct ; that it was entered into for the purpose of pooling the profits of the grain trade and the formation of a grain trust among the buyers, and that it had those effects.   Such an agreement would have been void and non-enforceable at common law.   It would have been void and non-enforceable because restrictive of trade competition and because of its tendency to monopoly, and for these reasons it would have been declared opposed to the rules of public policy.   It is certainly competent for the legislature to make penal the doing of that which the courts themselves recognize as hurtful to the body politic and for that reason refuse to countenance.   The legislature of 1897 did that ; nor did it do anything more.   It is no argument to launch the platitudes of personal liberty and freedom of contract and due process of law, etc., against this statute.   What specific prohibition does it contain that the common law has not contained for ages past ?   Absolutely none.

We come now to a final question.   The first statute for the suppression of unlawful trade combinations enacted in this state was chapter 175 of the Laws of 1887 (Gen. Stat. 1901, §§ 2427–2429).   That statute was directed against grain dealers alone.   Section 1 reads as follows :

"That it shall be unlawful for any grain dealer or grain dealers, partnership, company, corporation, or association of grain dealers, or any other person or persons, partnership, company, corporation, or association, to enter into any agreement, contract or combination with any other grain dealer or grain dealers, partnership, company, corporation, or association of grain dealers, or any other person or persons, partnership, company, corporation, or association, for the pooling of prices of different and competing dealers and buyers, or to divide between them the aggregate

or net proceeds of the earnings of such dealers and buyers, or any portion thereof, or for fixing the price which any grain dealer or grain dealers, partnerships, company, corporation, or association of grain dealers, or any other person or persons, partnership, company, corporation, or association, shall pay for grain, hogs, cattle, or stock of any kind or nature whatever; and in case of any agreement, contract or combination for such pooling of prices of different and competing dealers and buyers, or to divide between them the aggregate or net proceeds of the earnings of such dealers and buyers, or any portion thereof, or for fixing the price which any grain dealer or grain dealers, partnership, company, corporation, or association of grain dealers, or any other person or persons, partnership, company, corporation, or association, shall pay for grain, hogs, cattle, or stock of any kind or nature whatever, each day of its continuance shall be deemed a separate offense."

The above-quoted section was followed by another, prescribing a penalty. The court, in the instructions to the jury in this case, quoted the act of 1887, and likewise quoted the one of 1897, above discussed. The jury were not told which of the acts was applicable to defendant's case. The claim is made that the act of 1887 was repealed by the later one, and hence that the defendant may have been convicted under a statute which had ceased of existence. It will be observed that the act of 1897 covers an entire field of which the one of 1887 covered only a part; but the one of 1897 covers, though in general terms, the specific matter embraced in the earlier act. The character of punishment and maximum penalty are the same in the case of both acts, and the appellant's sentence of conviction was within the terms of either one. Assuming that the act of 1887 was repealed by implication by that of 1897, what, if any, effect to produce the appellant's conviction is to be attributed to the court's

reference to the earlier enactment? We think none whatever. The statute of 1887 did not define the offense charged in any other terms than does the later act, nor did it define it in any other terms than the court was required to define it and did define it in the charge to the jury. The facts to be proved under the statute of 1887 were no different from the facts which, by the act of 1897, were required to be proved against the defendant, and it is impossible to see in what way he could have been prejudiced by the mistake of the court, if mistake it was.

However, it is said that if the statute of 1887 was not repealed by that of 1897, but is still to be classed among the existing enactments, it is unconstitutional, because it is class legislation. It is said that it singles out grain dealers from among all the different classes of persons engaged in domestic commerce and subjects them to penalties for doing that which the other classes are allowed to do without let or hindrance. Grant it (which, however, we do not, except hypothetically and for reply to the proposition), an unconstitutional statute is no different from a repealed statute. Like a statute repealed, it is no statute at all. Hence, if the appellant could not be harmed by the court's quotation of a repealed statute, he could not be harmed by the quotation of an unconstitutional statute. The general rule in criminal as in civil cases is that errors harmless in their nature— nominal errors, but not errors in fact—shall not be ground of reversal. It is expressed in the criminal code, section 293 (Gen. Stat. 1901, §5731): "On an appeal, the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties." The above provision of the code has been often interposed

against technical and unsubstantial claims of error in criminal cases, and especially in cases where immaterial, but unprejudicial, evidence has been admitted and mistaken, but harmless, instructions have been given.. (*The State v. Hilton*, 35 Kan. 338, 349, 11 Pac. 164; *The State v. Baldwin*, 36 id. 1, 14, 12 Pac. 318.)

Some minor claims of error are made. They do not involve anything fundamental, but relate to unimportant matters of practice. However, we have examined them, and perceive that none of them is well founded. The judgment of the court below is affirmed.

JOHNSTON, SMITH, CUNNINGHAM, GREENE, ELLIS, JJ., concurring.

POLLOCK, J. (dissenting): Believing, as I do, that no recent decision of this court is comparable in its consequences to the public at large, especially the business and commercial world, with that just announced in this case; convinced beyond all reasonable doubt that legislation so drastic in terms, tending in such large measure to make criminal the otherwise innocent, every-day affairs of life,. should not be upheld by this court; and fully satisfied beyond all escape from the conviction that the act itself in express terms involves more of personal liberty and the rights of private property in turpitude and crime than has any prior act ever upheld by this court; and also convinced that the process of reasoning employed in the opinion for the purpose of upholding the act is inherently and radically false in principle and dangerous in .conclusion, I refuse to concur therein, and respectfully state my reasons therefor.

A careful reading of the opinion will disclose the fact that the validity of the act in question is first at-

tempted to be maintained by tacitly admitting the language of the act to be in violation of the fourteenth amendment to the federal constitution, but upholding its validity by excluding from its condemnation those cases which the court may deem to have been in excess of the legislative power, upon the theory that the legislature did not intend to include such cases as would impair the validity of the act; and by denying appellant the right to question the validity of the act under which he has been tried, convicted, and sentenced, upon the ground that under the facts charged against him he does not belong in the category of cases which the court should exclude by construction, and therefore he cannot be heard to complain of his punishment or challenge the validity of the act under which he is punished. That this is a fair construction of the language employed, and the true ground upon which the opinion is based, will appear from the first and second points of the syllabus and the corresponding portions of the opinion, and from the further fact that the law as stated in the syllabus, and the argument employed in the opinion, can have no place in this case if it be not admitted that the act in certain respects is unconstitutional and void.

If it be within the province of the courts thus to separate the valid from the void provisions of the statute by construction, and give force to the valid, so ascertained, and reject the void, it is difficult to comprehend why any legislative act should be declared void *in toto*. What the legislature creates void, the courts, the final arbiters of the power of the legislature to create, can reconstruct, separate, and make good. It is a settled rule that courts shall resolve all doubts in favor of the constitutionality of the statute challenged, and in all cases where possible, consis-

tently with the rules of law, uphold the validity of the statute. Hence, if the doctrine announced in this case be sound, in no case should an entire act be overthrown by the courts. On the contrary, it would become the duty of the court to reject those provisions beyond the constitutional power of the legislature to include in an act as not intended by the legislature to be included, because beyond its power to do so, and enforce the remainder. Is this doctrine sound in principle and fortified by authority? It is the settled rule of interpretation of statutes that the words employed by the law-making power are to be first consulted. When their meaning is clear, plain, and unambiguous, there is no room left for interpretation. Mr. Black, in his work on Interpretation of Laws, section 43, says:

"But it must be observed that the presumption of constitutionality, like all the other presumptions of this class, is available only in case of doubt or ambiguity. The courts cannot revise or correct an act of the legislature in order to make it conform to the constitution. If it is plainly and palpably invalid, it is their duty to so declare it. Where the language is not ambiguous, and the meaning is clear and obvious, an unconstitutional consequence cannot be avoided by forcing upon the language of the act a meaning which, upon a fair test, is repugnant to its terms."

The first section of the act in question creates and defines the offense. The parts are interdependent and inseparable, constituting one general scheme. All acts therein prohibited are made alike criminal. There is no attempt at classification. All acts inhibited are alike criminal; all persons violating the act alike criminals. In such case the entire section must stand or fall together. Separation is impossible. Either all is good or all bad. Mr. Justice Field, in *Norton v.*

*Shelby County,* 118 U. S. 425, 6 Sup. Ct. 1121, 30 L.
Ed. 178, said :

"An unconstitutional act is not a law ; it confers no
rights ; it imposes no duties ; it affords no protection ;
it creates no office ; it is, in legal contemplation, as
inoperative as though it had never been passed."

I have no desire to dispute the familiar and well-
recognized rule of law, that when part of a statute is
constitutional and part is unconstitutional, that which
is constitutional will, if capable of separation and in-
dependent enforcement, be separated and enforced,
and that which is unconstitutional be rejected.   This
is a principle so well recognized and of such every-day
application in courts of justice that a citation of au-
thorities in its support is unnecessary and inappropri-
ate.   I dispute neither the existence nor the soundness
of this rule in cases where applicable.   What I do
deny is its application to this case, and the manner
in which it is applied to the case.   The writer of the
opinion, after stating the rule and its exception, states
the extension of the rule applied in this case, as fol-
lows :

"However, the rule is not limited to such instances.
*It applies as well to exclude from the operation of the stat-
ute subjects and classes of things lying without the legis-
lative intent, although comprehended within the general
terms of the act, as it does to exclude parts of the verbal
phraseology.*"

He makes application of the extension of the rule in
the following manner :

"He cannot be heard to object to the statute merely
because it operates oppressively upon others.   The
hurt must be to himself.   The case, under appellant's
contention as to this point, is not a case of favoritism
in the law.   It is not a case of exclusion of classes
who ought to have been included, the leaving out of

which constitutes a denial of the equal protection of the law, but it is the opposite of that. · *It is a case of the inclusion of those who ought to have been excluded. Hence, unless appellant can show that he himself has been wrongly included in the terms of the law, he can have no just ground of complaint.* This is fundamentally and decisively settled."

This is not the first instance in which it has been attempted to uphold the validity of an enactment beyond the constitutional power by limiting the scope of the act by construction, and thus eliminating the provisions in conflict with the organic law. But limitation by construction is not separation. It is merely an attempt on the part of the court both to make and enforce laws without the aid of the legislative branch of the government. Chief Justice Waite, in *United States v. Reese et al.*, 92 U. S. 214, 23 L. Ed. 563, said of this doctrine :

"There is no attempt in the sections now under consideration to provide specifically for such an offense. If the case is provided for at all, it is because it comes under the general prohibition against any wrongful act or unlawful obstruction in this particular. We are, therefore, directly called upon to decide whether a penal statute enacted by congress, with its limited powers, which is in general language broad enough to cover wrongful acts without as well as within the constitutional jurisdiction, can be limited by judicial construction so as to make it operate only on that which congress may rightfully prohibit and punish. For this purpose, we must take these sections of the statutes as they are. We are not able to reject a part which is unconstitutional, and retain the remainder, because it is not possible to separate that which is unconstitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not now there. Each of the sections must stand as a

whole, or fall altogether. The language is plain. There is no room for construction, unless it be as to the effect of the constitution. The question, then, to be determined is, whether we can introduce words of limitation into a penal statute so as to make it specific, when, as expressed, it is general only.

"*It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.* This would, to some extent, substitute the judicial for the legislative department of the government. The courts enforce the legislative will when ascertained, if within the constitutional grant of power. Within its legitimate sphere, congress is supreme, and beyond the control of the courts ; but if it steps outside of its constitutional limitations, and attempts that which is beyond its reach, the courts are authorized to, and, when called upon in due course of legal proceedings, must annul its encroachments upon the reserve power of the states and the people.

"To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one. This is not part of our duty."

Mr. Justice Matthews, in delivering the opinion in the *Virginia Coupon Cases*, 114 U. S. 270, 5 Sup. Ct. 903, 29 L. Ed. 185, says :

"It is undoubtedly true that there may be cases where one part of a statute may be enforced as constitutional, and another be declared inoperative and void, because unconstitutional ; but these are cases where the parts are so distinctly separable that each can stand alone, and where the court is able to see, and to declare, that the intention of the legislature was that the part pronounced valid should be enforceble, even though the other part should fail. To hold otherwise would be to substitute for the law intended by the legislature one they may never have been willing by itself to enact. An illustration of this principle is found in the *Trade-mark Cases*, 100 U. S. 82, 25

18—65 KAN.

L. Ed. 550, where an act of congress which, it was claimed, would have been valid as a regulation of commerce with foreign nations and among the states, was held to be void altogether, because it embraced all commerce, including that between the citizens of the same state, which was not within the jurisdiction of congress, and its language could not be restrained to that which was subject to the control of congress. 'If we should,' said the court in that case, 'in the case before us undertake to make, by judicial construction, a law which congress did not make, it is quite probable we should do what, if the matter were now before that body, it would be unwilling to do.'"

In the case of *Baldwin v. Franks*, 120 U. S. 678, 7 Sup. Ct. 656, 763, 32 L. Ed. 766, Chief Justice Waite, in delivering the opinion, said :

"It is now said, however, that in that case the conspiracy charged was by persons in a state against a citizen of the United States and of the state, to deprive him of the protection he was entitled to under the laws of that state, no special rights or privileges arising under the constitution, laws or treaties of the United States being involved ; and it is argued that, although the section be invalid so far as such an offense is concerned, it is good for the punishment of those who conspire to deprive aliens of the rights guaranteed to them in a state, by the treaties of the United States. In support of this argument, reliance is had on the well-settled rule that a statute may be in part constitutional and in part unconstitutional, and that under some circumstances the part which is constitutional will be enforced, and only that which is unconstitutional rejected. To give effect to this rule, however, the parts— that which is constitutional and that which is unconstitutional — must be capable of separation, so that each may be read by itself. This statute, considered as a statute punishing conspiracies in a state, is not of that character, for in that connection it has no parts within the meaning of the rule. Whether it is separable, so that it can be

enforced in a territory, though not in a state, is quite
another question, and one we are not now called on
to decide.  It provides in general terms for the pun-
ishment of all who conspire for the purpose of depriv-
ing any person, or any class of persons, of the equal
protection of the laws, or of equal privileges or im-
munities under the laws.  A single provision, which
makes up the whole section, embraces those who con-
spire against citizens as well as those who conspire
against aliens — those who conspire to deprive one of
his rights under the laws of a state, and those who
conspire to deprive him of his rights under the con-
stitution, laws or treaties of the United States.  *The
limitation which is sought must be made, if at all, by
construction, not by separation.  This, it has often been
decided, is not enough.*"

See, also, Sutherland on Statutory Construction,
section 173 ; *Trade-mark Cases,* 100 U. S. 82, 25 L.
Ed. 550 ; *United States v. Harris,* 106 U. S. 629, 1 Sup.
Ct. 601, 27 L. Ed. 290 ; *Wynehamer v. The People,* 13
N. Y. 378 ; *Meshmeier v. The State,* 11 Ind. 482.

Nor are the cases cited and relied on by the
writer of the opinion to support the doctrine an-
nounced in conflict with the views here expressed.
The cases of *Supervisors v. Stanley,* 105 U. S. 305, 26
L. Ed. 1044, and *Commonwealth v. Gagne,* 153 Mass.
205, 26 N. E. 449, 10 L. R. A. 442, arose upon a con-
flict between legislative acts, state and federal, no
question of conflict between a legislative act and the
organic law being involved.  In none of the cases
cited did the decision turn upon the power of the
court to separate and eliminate from a legislative act
by construction those cases provided for by the terms
of the act which would render it in conflict with the
organic law.

It certainly needs no argument to satisfy the mind,
no citation of authorities to support the contention,

that, if the act in question in express terms strikes
down personal rights guaranteed to all by the federal
constitution, in so doing the act is completely and
utterly void, and an appellant tried, convicted and
punished under this void act can assert its invalidity,
although it may appear from the charge contained in
the information and the evidence at the trial that he
might be convicted under a proper law. Mr. Justice
Wood, delivering the opinion of the court in *United
States v. Harris*, supra, commenting upon and apply-
ing the decision in *United States v. Reese*, supra, said :

"The indictment in the case charged two inspectors
of a municipal election in the state of Kentucky with
refusing to receive and count at such election the
vote of William Garner, a citizen of the United States,
of African descent. It was contended by the defend-
ants that it was not within the constitutional power
of congress to pass the section upon which the indict-
ment was based. The attempt was made by the
counsel for the United States to sustain the law as
warranted by the fifteenth amendment to the consti-
tution of the United States. But this court held it not
to be appropriate legislation under that amendment.
*The ground of the decision was that the sections referred to
were broad enough not only to punish those who hindered
and delayed the enfranchised colored citizen from voting,
on account of his race, color, or previous condition of servi-
tude, but also those who hindered or delayed the free white citi-
zen.* The court, speaking by the chief justice, said :
'It would certainly be dangerous if the legislature
could set a net large enough to catch all possible of-
fenders, and leave it to the courts to step inside and
say who could be rightfully detained, and who should
be set at large. This would, to some extent, substi-
tute the judicial for the legislative department of the
government. The courts enforce the legislative will,
when ascertained, if within the constitutional grant
of power. But if congress steps outside of its consti-
tutional limitation and attempts that which is beyond
its reach, the courts are authorized to, and when called

upon must, annul its encroachment upon the reserved rights of the states and the people.'''   (Page 642.)

This precise question was considered also in *Wyne-hamer v. The People*, supra, in which Mr. Justice Johnson said :

"The prohibitions of the first section, taken together, and they form but a single scheme and are to be enforced by the same penalties, cannot, therefore, in my judgment, be upheld, at least in respect to property which had been acquired while there was no prohibition against the acquisition of such property. The future acquisition the legislature might, in my opinion, control, and I am not disposed to deny that they could have subjected such future acquisitions to the prohibitions this act imposes. But in this act they have made no discrimination. The provisions extend, and were clearly meant to extend, to all liquors. It is no part of the proof to make out the offense according to the statute, to show that the liquors were acquired after the prohibitions became operative, nor is the fact that they were previously acquired any defense under the statute. *The only way of defending against it, on the ground in question, is by asking to have it declared void. Laws in relation to civil rights are sometimes held to be unconstitutional, in so far as they affect the rights of certain persons, and valid in respect to others.* This is done mainly upon the ground that the courts will not construe them to relate to such cases as the legislature had not power to act upon. *To statutes creating criminal offenses, such a rule of construction ought not to be applied, and I cannot find any trace of its ever having been applied.* It is of the highest importance to the administration of criminal justice, that acts creating crime should be certain in their terms, and plain in their application ; and it would be in no small degree unseemly that courts should be called upon, in administering the criminal law, to adjudge an act creating offenses at one time valid and at another time void. It must, I think, stand as it has been enacted, or not stand at all."

The statute under consideration is criminal. The acts condemned and punished thereby were neither criminal nor unlawful at common law. The rule of strict construction applies in this case with all its force. The cases cited in the opinion in support of the doctrine announced are civil cases. An examination will show their inapplicability in this case. That the rule of separation of valid from void, rejecting the void and upholding the good by construction, employed in this case, is wrong in principle, I have no doubt. That the appellant may be heard to question the power of the legislature to enact the law under which he stands convicted, I do not doubt. To hold that he may is sound in reason and fully settled by the authorities above cited.

But it is contended by the writer of the opinion that there is a distinction between federal and state legislation; that congress possesses only such legislative power as is expressly granted by the federal constitution, whereas the legislature of the state possesses all legislative power not expressly withheld by the constitution of the state. Therefore, the reasoning employed in the above cases, construing federal statutes as opposed to the federal constitution, is inapplicable to the case at bar, and the case of *Waters-Pierce Oil Company v. Texas*, 177 U. S. 28, 42, 20 Sup. Ct. 518, 44 L. Ed. 657, is relied upon to support the contention made. Such reasoning is more to be admired for its ingenuity than to be commended for its logic. While the rule governing the power of national and state legislatures to legislate is correctly stated, yet it does not follow that a different rule of construction is to be employed in arriving at a conclusion as to the validity of an act challenged as obnoxious to the federal constitution. That constitution is the supreme law of the land,

equally binding upon this court and the federal supreme court. The fourteenth amendment does not touch upon federal legislation, but is an express limitation upon legislation by a state. If the act in question is violative of its prohibitive provisions it is void, and that is an end of it. The question before us, which should be squarely met, is, whether the act under consideration contravenes the federal constitution, and not whether this court may attempt to hew round it by the process of specious reasoning employed. The case cited is not in point, and does not touch upon the question at issue here. The question involved in the Waters-Pierce Oil Company case, and the only one, was the power of the state of Texas to impose conditions upon a foreign corporation desiring to transact business in that state. The question sought to be raised by counsel for plaintiff in error in that case is the one raised in the case at bar. The authorities relied on here are the authorities cited there. It was ruled in that case, not that the contention here made is untenable or the authorities cited unsound or inapplicable to the question, but that the question here at issue was not involved in that case.

It is also worthy of remark here that the able counsel representing the state, neither in their voluminous briefs nor at the oral argument, made mention of the doctrine applied by the court. Nor have counsel for appellant been heard upon this proposition.

Is the act of 1897 within the legislative power of the state, constitutional, and valid? What may be the extent of power possessed by the state over quasi-public corporations engaged in the performance of a public service, or what the power of congress to control and regulate such servants of the public under the interstate-commerce clause of the federal

constitution, is not the question in controversy. The power of the state to prevent the formation of monopolies and combinations tending to monopoly, and exercising control over them to prevent public oppression, is not the subject under consideration. The power of the state to prohibit such combinations as may to an unreasonable extent restrain trade or commerce, or may unreasonably restrict competition in trade, commerce, manufacturing, or business, is not the question at issue. By the act in question the legislature has attempted to prohibit, by combinations of capital, skill, or acts, all restraint upon trade and commerce and all restriction upon trade, commerce, manufacturing, or transportation, whether such restriction is in its nature and extent such as may be reasonable and necessary to the self-preservation and protection of the parties engaged from financial ruin or oppressive to the public. Unbridled competition, which is in effect a license to the strong to destroy and obliterate the weak, is commanded. With the public policy of this act, whether wise or unwise, we have no concern. With the power of the legislature to enact this law, and the duty of the courts to command its enforcement or deny its validity as opposed to the fundamental law of the land, we are concerned.

The right of the legislature, in the exercise of what is called the police power of the state, to restrain and prohibit monopolies and combinations tending to monopoly, is freely granted. The power of the legislature to prohibit such restrictions upon trade and commerce as are in their nature unreasonable, and to condemn such restraints upon competition in trade and commerce as are unreasonable, oppressive, and injurious to the public, is also admitted. But that, in a free government, the right of two or more persons,

firms or corporations transacting commercial or other business, drawn into unreasonable and destructive competition, threatening financial ruin, to agree one with the other to restore and maintain the price of their goods at or above cost, having in view the laudable and reasonable purpose of averting financial self-destruction, every right-minded man must concede. A denial of such right is a denial of the right of self-defense, is oppression, is tyranny. Yet, that such an agreement ¬is clearly within the prohibition of the act in question is not open to dispute. The right of two or any number of persons engaged in agriculture to agree that they will combine and place their agricultural products in elevators and storehouses, and that they will not sell the same until a certain price is obtained, which price will net them a profit for their labor, is founded upon such natural justice as to be beyond the reach of legislative power to prohibit. Yet such right is by the act denied. Many of the states have exercised the power of fixing, for those engaged in transportation, such maximum and minimum rates of carriage as shall not be exceeded, under penalty of the law. Yet any combination of those engaged in transportation to charge only the minimum rate so fixed is, in terms, prohibited by this act. Other examples may be given *ad libitum*. Upon an examination of the act, others will occur to the mind *ad infinitum*. All combinations, justifiable or unjustifiable, reasonable or unreasonable, necessary or unnecessary, beneficial or oppressive to the public, are alike prohibited and made criminal. Under this act, the fact that the prohibited agreement was made for justifiable ends, or for self-preservation, is no defense.

May such an act exist in a free country? Will such an act be enforced in a free government? Any

student at all familiar with history will recall the baneful and disastrous effect of kindred legislation in England, Italy, and other European countries, where the legislative power operates untrammeled by a written constitution. It is useless in the consideration of this question to attempt a citation or review of the many authorities in this country making application of the provision found in the fourteenth amendment to the federal constitution to such legislation. The English authorities have no application, because announced under no written constitution. The source of power relied on to support this act and all others of kindred character is the police power of the state, but this power has, and of necessity must have, its limitations. That the police power, or any power of the state, authorizes the act in question, I deny. I deny it because it is an unwarranted abridgment of personal liberty; because it takes away private property without due process of law; because it denies equal protection under the law, without justifiable ends. A legislature may become as much a tyrant as a czar or a king.

"By the term 'liberty,' as used in the provision, something more is meant than mere freedom from physical restraint or the bonds of a prison. It means freedom to go where one may choose, and to act in such a manner, not inconsistent with the equal rights of others, as his judgment may dictate for the promotion of his happiness; that is, to pursue such callings and avocations as may be most suitable to develop his capacities and give to them their highest enjoyment." (Mr. Justice Field, in *Munn v. Illinois*, 94 U. S. 113, 24 L. Ed. 77.)

The federal constitution declares:

"This constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under

the authority of the United States, shall be the supreme law of the land, and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding."

The fourteenth amendment to the constitution is:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Guizot, in his lectures on Government, says:

"Liberties are nothing until they have become rights, positive rights, formally recognized and consecrated; rights, even when recognized, are nothing so long as they are not entrenched within guaranties; and, lastly, guaranties are nothing so long as they are not maintained by forces independent of them in the limit of their rights; surround rights by guaranties; entrust the keeping of those rights to forces independent of them; such are the necessary steps in the progress towards a free government."

Mr. Justice Field, in *Slaughter-house Cases*, 16 Wall. 36, 21 L. Ed. 394, quoting from *Live-stock &c. Association v. The Crescent City &c. Company*, 1 Abb. 398, said:

"It is one of the privileges of every American citizen to adopt and follow such lawful industrial pursuit, not injurious to the community, as he may see fit, without unreasonable regulation or molestation."

And again:

"There is no more sacred right of citizenship than the right to pursue unmolested a lawful employment in a lawful manner. It is nothing more nor less than the sacred right of labor."

Mr. Eddy, in his work on Combinations, section 681, says:

"Any extension of the police power beyond the pre-

serving of peace and order in the community and the protection of life, health and morals of the individual, is a departure so radical as to be absolutely destructive of all limitations upon the exercise of the power. If the state can go beyond considerations affecting the peace and order of the community and the life, health or morals of the individual, and intervene for reasons of a purely social or economic nature, then there are no limitations whatsoever upon the power of legislatures to intervene and in their discretion dictate terms upon which various contracts shall be made and different occupations pursued.''

In *Frorer et al. v. The People*, 141 Ill. 171, 31 N. E. 395, 16 L. R. A. 492, it was said :

''Other instances of statutory regulations of private rights are in lien laws in favor of homesteaders, mechanics, etc. ; limitation laws ; the statute of frauds, and other statutes relating to evidence ; laws in regard to pleadings ; exemption laws and insolvent laws. But these all relate, not to the power to contract in regard to matters of general right, but to the remedy for the enforcing of contracts, as to which the legislature may make such regulations as the public welfare seems to demand, so long as, under pretense of regulating the remedy, it does not impair the right itself.''

In *Braceville Coal Co. v. The People*, 147 Ill. 66, 37 Am. St. Rep. 206, 35 N. E. 62, 22 L. R. A. 340, it was held :

''Constitutional liberty means not only freedom of the citizen from servitude and restraint, but includes the right of every man to be free in the use of his powers and faculties, and to adopt and pursue such avocation or calling as he may choose, subject only to the restraints necessary to secure the common welfare.''

In the opinion it was said :

''The fundamental principle upon which liberty is based in free and enlightened government is equality

under the law of the land. It has, accordingly, been everywhere held that liberty, as that term is used in the constitution, means not only freedom of the citizen from servitude and restraint, but is deemed to embrace the right of every man to be free in the use of his powers and faculties and to adopt and pursue such avocation or calling as he may choose, subject only to the restraints necessary to secure the common welfare. (*Frorer v. The People*, 141 Ill. 171; *Perry v. Commonwealth,* 155 Mass. 117; *People v. Gillson*, 109 N. Y. 389; *Live-stock Association v. Crescent City*, 1 Abb. 398; *Slaughter-house Cases*, 16 Wall. 36; *Godcharles v. Wigeman*, 113 Pa. St. 431; *State v. Goodwill*, 33 W. Va. 179.)

"Property, in its broader sense, is not the physical thing which may be the subject of ownership, but is the right of dominion, possession and power of disposition which may be acquired over it; and the right of property, preserved by the constitution, is the right not only to possess and enjoy it, but also to acquire it in any lawful mode or by following any lawful industrial pursuit which the citizen, in the exercise of the liberty guaranteed, may choose to adopt."

In *Ritchie v. The People*, 46 Am. St. Rep. 315, 155 Ill. 98, it was held:

"Statutes passed in pursuance of the police power must have some relation to the end sought to be accomplished. Where the ostensible object is to secure the public comfort, welfare, and safety, the statute must appear to be adapted to that end. It cannot invade the rights of persons and property under the guise of a mere police regulation when such is not the effect."

In the opinion it was said:

"But it is claimed on behalf of the defendant in error that this section can be sustained as an exercise of the police power of the state. The police power of the state is that power which enables it to promote the health, comfort, safety and welfare of society. It is very broad and far-reaching, but is not without its limitations. Legislative acts passed in pursuance

of it must not be in conflict with the constitution, and must have some relation to the ends sought to be accomplished ; that is to say, to the comfort, welfare or safety of society.  Where the ostensible object of an enactment is to secure the public comfort, welfare, or safety, it must appear to be adapted to that end ; it cannot invade the rights of person and property under the guise of a mere police regulation, when it is not such in fact ; and, where such an act takes away the property of a citizen or interferes with his personal liberty, it is the province of the courts to determine whether it is really an appropriate measure for the promotion of the comfort, safety and welfare of society.  (*Lake View v. Rosehill Cem. Co.*, 70 Ill. 191 ; *In re Jacobs*, 98 N. Y. 98 ; *The People v. Gillson*, 109 id. 389.)''

Mr. Justice Harlan, in declaring the anti-trust act of the state of Illinois unconstitutional and void, in the recent case of *Connolly v. The Union Sewer Pipe Company*, supra, said :

''The question of constitutional law, to which we have referred, cannot be disposed of by saying that the statute in question may be referred to what are called the police powers of the state, which, as often stated by this court, were not included in the grants of power to the general government, and therefore were reserved to the states when the constitution was ordained.  But as the constitution of the United States is the supreme law of the land, anything in the constitution or statutes of the states to the contrary notwithstanding, a statute of a state, even when avowedly enacted in the exercise of its police powers, must yield to the law.  No right granted or secured by the constitution of the United States can be impaired or destroyed by a state enactment, whatever may be the source from which the power to pass such enactment may have been derived.  'The nullity of any act inconsistent with the constitution is produced by the declaration that the constitution is the supreme law.'  The state has undoubtedly the power, by appropriate

legislation, to protect the public morals, the public health, and the public safety, but, if by their necessary operation, its regulations looking to either of those ends amount to a denial to persons within its jurisdiction of the equal protection of the laws, they must be deemed unconstitutional and void. (*Gibbons v. Ogden,* 9 Wheat. 1, 210 ; *Sinnot v. Davenport,* 22 How. 227 ; *M. K. & T. Ry. Co. v. Haber,* 169 U. S. 613.'')

True, in that case the act under consideration was declared void because denying equal protection under the law ; but if the police power of the state of Illinois was insufficient to uphold the law because that act contravened the fourteenth amendment to the federal constitution, how may it be contended that the same source of power relied on here will uphold this act which deprives the citizen of his property without due process of law—that is, arbitrarily denies to those engaged in certain branches of trade and business the right to contract with relation to that business and their private property ; arbitrarily denies the right so to conduct their business as they may choose without injury to others ; arbitrarily and unreasonably interferes with the liberty of private contracts not injurious to the public morals, public health or public safety ?   It was said by Judge McPherson, in *Niagara Fire Ins. Co. v. Cornell,* 110 Fed. 816, in declaring the anti-trust act of Nebraska unconstitutional and void upon this precise ground :

''If we cannot acquire property, then we have a government of socialism.   And how can we acquire property, or enjoy the property we do have, without the right of contract?   If this law is valid, two or more farmers cannot agree that they will not sell their wheat to a neighboring mill for less than so much per bushel.   Two or more farmers cannot agree that the live-stock feeder shall not have their corn,

only at a certain price. Blacksmiths cannot agree that they will charge so much for shoeing horses. Nothing can be agreed to by the manufacturer, the farmer, the gardener, the contractor, consumer or laborer to prevent the reduction of price. Can it be possible that such legislation is valid? If it is valid, then what becomes of the provision, 'No man shall be deprived of equal protection of the law,' or of that other provision, 'No man shall be. deprived of life, liberty or property without due process of law'?"

As was said by Judge Catron in *Wally v. Kennedy*, 2 Yerg. 554, and *Vansant v. Waddel*, 2 id. 270:

"The rights of every individual must stand or fall by the same rule or law, that governs every other member of the body politic, or land, under similar circumstances; and every partial, or private law, which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void. Were it otherwise, odious individuals or corporate bodies would be governed by one law, the mass of the community, and those who made the law, by another; whereas a like general law, affecting the whole community equally, could not have been passed." (Page 555.)

"The idea of a people, through their representatives, making laws whereby are swept away the life, liberty and property of one or a few citizens, by which neither the representatives nor their other constituents are willing to be bound, is too odious to be tolerated in any government where freedom has a name. Such abuses resulted in the adoption of magna charta in England, . . . which is, and for centuries has been, the foundation of English liberty. Its infraction was a leading cause why we separated from that country, and its value as a fundamental rule for the protection of the citizen against legislative usurpation was the reason of its adoption as a part of our constitution." (Page 270.)

The argument made that the colossal aggregations

of capital and rapid formation of gigantic industrial trusts of recent years have created public alarm and wide-spread apprehension of danger, calling forth public clamor for enactments of the character in question by the legislature, and their enforcement by the courts, if true, is without merit here. There is no safety to the citizen where the convictions of law-makers and the settled principles of the law, as enunciated by the courts as well, melt away before the hot breath of public clamor.

Again, from the information it cannot be determined upon what act of the legislature the prosecution in this case is based. At the trial the court not only gave the jury in his charge the anti-trust act of 1897 above discussed, but also in his instructions gave to the jury the unlawful trust and combination act, chapter 175, Laws of 1887, found in chapter 145, General Statutes of 1897 (Gen. Stat. 1901, §§ 2427–2429), quoted at length in the opinion. By instruction number 4 the jury were directed as follows:

"Gentlemen of the jury, you are instructed that if you find from the evidence that the defendant, E. J. Smiley, did, on or about the 20th day of November, 1900, unlawfully enter into an agreement, contract, and combination, in the county of Rush and state of Kansas, with certain partnerships, companies, corporations of grain dealers and grain buyers in the town of Bison, in the said county and state, and you further find that the said parties were competitive grain buyers, dealers, and buyers, to pool and fix the price the said grain dealers and buyers should pay for grain at the said place, and to divide between them the net earnings of the said grain dealers and grain buyers, and to prevent competition in the purchase and sale of grain among the said dealers and buyers, that would be a violation of chapter 145, and you should so find, and find the defendant guilty."

19—65 KAN.

That this act of 1887 is clearly unconstitutional and void, because denying equal protection under the law, is scarcely a debatable question. It singles out one class of persons engaged in domestic trade and commerce from the general class, and makes acts done by them criminal which, if done by other members of the general class, remain innocent. That such legislation cannot be upheld is not only in effect conceded in the opinion, but is conclusively settled by authority.

In *Connolly v. Union Sewer Pipe Company*, supra, it was said :

" We conclude this part of the discussion by saying that to declare that some of the class engaged in domestic trade or commerce shall be deemed criminals if they violate the regulations prescribed by the state for the purpose of protecting the public against illegal combinations formed to destroy competition and to control prices, and that others of the same class shall not be bound to regard those regulations, but may combine their capital, skill or acts to destroy competition and to control prices for their special benefit, is so manifestly a denial of the equal protection of the laws that further or extended argument to establish that position would seem to be unnecessary." ( See, also, *In re Grice*, 79 Fed. 627 ; *Niagara Ins. Co. v. Cornell*, supra.)

The validity of this act of 1887 is directly and pointedly challenged by the record, and urged upon this court by counsel in their briefs and at the oral argument, yet this question is disposed of as wholly immaterial and harmless error. By what means this court ascertained what influence the charge of the court upon the act of 1887 had upon the minds of the jury is not shown. How it determined the jury would have convicted had this portion of the charge been omitted is not clear. The defendant is engaged in the grain business ; the act of 1887 is directed

against grain dealers; the conspiracy charged in the information is one with grain dealers; the unlawful acts charged therein relate solely to the grain trade; all the evidence found in the record pertains to the grain business; and yet escape is made from the consideration of the validity of the act of 1887 because, in the judgment of the court, the defendant might have been tried and convicted under the act of 1897. Section 236 of the criminal code (Gen. Stat. 1901, § 5681) provides:

"The judge must charge the jury in writing, and the charge shall be filed among the papers of the cause. In charging the jury, he must state to them all matters of law which are necessary for their information in giving their verdict."

This court has held that the failure of a trial court, although not requested so to do, fully to instruct the jury upon the law governing the case, under the above section, is material error. ( *The State v. Grubb*, 55 Kan. 678, 41 Pac. 951.) By a parity of reasoning, and upon general principles, it must be true that the action of a trial court upon a criminal prosecution instructing the jury to ascertain and determine the guilt of the defendant by a statute which is not the law, but is unconstitutional and void, is equally erroneous, and reversible error.

The conviction in this case should be set aside.